## In re MAAGET.

### (District Court, S. D. New York. June 20, 1911.)

1. BANKRUPTCY ⊜═►407(5)—DISCHARGE—GROUNDS FOR DENIAL—FALSE FINAN-
CIAL STATEMENT.
 A bankrupt's written statement of his financial condition, from which
 liabilities are omitted, cannot be defended on the ground that assets were
 also omitted, and that the balance was therefore substantially correct, as
 a merchant is concerned, not only with the net surplus, but with its pro-
 portion to the liabilities.

2. BANKRUPTCY ⊜═►407(5)—DISCHARGE—GROUNDS FOR DENIAL—FALSE FINAN-
CIAL STATEMENT.
 A bankrupt's omission of obligations from a statement of his financial
 condition was not excusable, though he thought it would do no harm to
 omit them.

3. BANKRUPTCY ⊜═►414(1)—PROCEEDINGS FOR DISCHARGE—MATTERS TO BE
PROVED.
 To defeat a discharge on the ground that a bankrupt omitted obliga-
 tions from a financial statement made by him, it is necessary to show
 either expressly or impliedly, that he knew the obligations existed and
 could be enforced against him.

4. BANKRUPTCY ⊜═►414(3)—PROCEEDINGS FOR DISCHARGE—SUFFICIENCY OF EVI-
DENCE.
 Where a bankrupt, charged with omitting liabilities from a statement
 of his financial condition, claimed that it was agreed with the sellers
 of goods that they should not be counted against his line of credit while
 they remained in a warehouse, but it appeared that, after a balance of
 the bankrupt's books had been struck, the invoices therefor were entered
 on the books, without regard to the dates of delivery from the ware-
 house, the facts indicated a desire to keep them off of the books until the
 balance was taken, and that this scheme was devised by the bankrupt,
 who alone had any possible purpose to accomplish thereby, though he
 claimed that he was personally ignorant of what the bookkeeper did.

In Bankruptcy. In the matter of I. H. Maaget, bankrupt. On ap-
plication for a discharge. Discharge denied.

See, also, 173 Fed. 232; 179 Fed. 1019, 102 C. C. A. 664.

Marks & Marks, of New York City, for bankrupt.

Robert P. Levis, of New York City, for objecting creditors.

Ralph Wolf, of New York City, for objecting creditor American
Woolen Co. of New York.

Myers & Goldsmith, of New York City, for objecting creditors Boess-
neck, Broesel & Co. and Fred Butterfield & Co.

LEARNED HAND, District Judge. [1] I certainly cannot agree
with the proposition that a bankrupt or any one else may defend a
written statement of his financial condition, merely by showing that
the balance is substantially correct, nor does it appear that the learned
master so thought. It needs no argument to show that a financial state-
ment, showing assets of $107,000 and liabilities of $63,000, is not a
correct statement of a business in which the assets are $157,000, and
the liabilities $113,000, any more than, to put extreme cases, it would
be a correct statement of a business in which the assets were $57,000

⊜═►For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and the liabilities $13,000, or the assets $1,157,000 and the liabilities $1,113,000. Still in each case the surplus is the same. A merchant is concerned, not only with the net surplus, but with its proportion to the liabilities, and everybody knows that who knows anything about financial statements, personal or corporate.

[2, 3] Therefore the question comes down to this: Did the bankrupt know that these omitted obligations were actual obligations on April 27, 1907. If he did, it is not commercially tolerable that he should omit them, even though he thought that it would do no harm. Nothing will more quickly destroy confidence in commercial dealings than to justify the statement of a merchant materially false, which professes fully to disclose the facts, because the merchant thought the omissions made no difference. By offering any statement at all, he assumes the rôle of candor, in which he must be throughout consistent; nor can he, by casuistical reservations, suppress a part out of what is given for the whole truth. All that it is necessary to show is that he knew that the obligations existed and that they could be enforced against him. That much, however, it is necessary to show, either expressly or implicitly; otherwise, the proof of fraudulent intent would fail, scienter being a part of the case.

[4] While the bankrupt probably had no accurate knowledge of the exact extent of his liabilities, it is, of course, wholly incredible that he should have been ignorant of liabilities nearly equal in amount to all those which he put in his statements. A number of the invoices were receipted for in his own hand, and for the rest it is impossible to believe that his acquaintance with his own affairs would have permitted ignorance of any such amount of receipts as are here involved. It is, moreover, only just to the bankrupt to say that he professes nothing of the kind, but takes the position that while the goods were held at the spongers, or at the warehouse, the understanding was that he should be under no liability. It was, of course, possible that he should have so understood his commercial relations, and that there should have been in fact an agreement of that kind, although it was of somewhat unusual character; but his testimony hardly goes far enough to meet the case. What he says is that it was agreed that while the goods remained in warehouse the indebtedness for purchase price should not be counted upon the credit which should be allowed to him; that is, against his "line of credit" with the various houses with whom he dealt. Assuming such an agreement to have been made, the result would not be to change his liability for the goods in law, of which there was the usual commercial evidence, but only to extend the amount of the credit allowed him. That the sellers might have agreed to this is also quite obvious, if they, by a control over the merchandise, had security for the indebtedness incurred through the sales. The most reasonable interpretation to be put upon his testimony is that he claims such an agreement to have been made with the sellers.

While such an agreement did not in fact change his liabilities in law, or the necessity of a statement of the facts, it is perhaps possible that he might have honestly supposed that they were no obligations at all, and that he might have omitted them for that reason. That belief is,

however, hardly consistent with the entry of them, in his books of account, as liabilities, without any comment, and especially with the precise time of entry of these particular bills. His position is that he did not regard the bills as liabilities until the "redelivery," as he calls it, from the warehouse, at the time when he wanted to begin work on them, or at least to put them in his own factory. That position would certainly have much support, had the entries been made of these liabilities only upon the dates when the "redeliveries" occurred; but they have no relation whatever to those dates. The books, indeed, show a great deal of the attitude of mind of the bookkeeper who kept them. The invoices were not entered at all until after the balance was struck of April 27th, although they had been received for a number of months before. Clearly the excuse of the bankrupt that they were not entered because of the haste of stock taking is ad captandum. As soon, or substantially as soon, as the balance was struck, these invoices were entered, $57,966.08 during the month of May alone, of which at least $50,000 were for receipts prior to April 27th. The bookkeeper did not think that these constituted an indebtedness only on "redelivery"; that much is beyond dispute. Moreover, he did think that in May they constituted an indebtedness, else he would not have entered them as such, for men do not put into their ledgers unperformed contracts. Had anything happened between the date of the invoices' receipt and the entry? Nothing but the striking of a balance from the books; certainly nothing which any sane man could suppose had the faintest relation to the existence of any indebtedness. Whoever controlled the books, therefore, certainly regarded the receipts as constituting an immediate liability, but wished for some reason to keep them off the books until the balance could be taken off without them. Consequently the bookkeeper, at least, had the requisite knowledge of the character of these transactions.

How of the bankrupt? He answers by saying that, whatever his bookkeeper may have done, at least he was personally ignorant of it, which is manifestly incredible, if my inferences from the books hitherto have been correct. Even assuming the unlikelihood of such unfamiliarity with his own books as this presupposes, no bookkeeper without instructions would have had the least conceivable incentive for any such conduct as these books show. There being no reasonable explanation but a desire by somebody to keep out of the books what were recognized as obligations, we must suppose him to have devised it who alone had any possible purpose to accomplish. Certainly Fink could have gained nothing. Unless we are to take the bankrupt's story quite naively, we must suppose that he directed that the obligations should be suppressed, because he did not wish the full extent of his commitments to become known.

I cannot accept the report upon this specification, and I find that it is proved. It will not, therefore, be necessary to consider the others. Discharge denied.