## WOOLEN CORPORATION OF AMERICA v. GITNIG et al.

Circuit Court of Appeals, Third Circuit. June 5, 1929.

No. 4048.

C. B. Wagoner and J. Wesley McWilliams, and Charles S. Wesley, all of Philadelphia, Pa., for appellant.

Julius C. Levi, David Mandel, Jr., Joseph A. Keough, and Alvin L. Levi, all of Philadelphia, Pa., for appellees.

Before BUFFINGTON, Circuit Judge, and THOMSON and SCHOONMAKER, District Judges.

SCHOONMAKER, District Judge. January 25, 1928, David Gitnig and Nathan Gitnig, individually and as copartners trading as Joseph Gitnig & Sons, were adjudged bankrupts, on their own petition. The same day the bankrupts made a composition offer of 33⅓ per cent., payable partly in cash and partly in notes. This offer was, after objection filed by the Woolen Corporation of America, enlarged to 35 per cent. payable all cash. The amended offer and objections were then referred by the District Court to a special referee, to ascertain and report the facts thereon, in accordance with section 12 of the Bankruptcy Act (11 USCA § 30). The referee reported favorably to the confirmation of the composition, and the District Court thereupon confirmed it. The Woolen Corporation then appealed from the confirmation order.

Two objections were urged in the court below, and in this court, to the confirmation of this composition; i. e., (1) the bankrupt had issued materially false financial statements in writing for the purpose of obtaining credit; and (2) the offer made was not for the best interest of creditors.

As to the first objection, the undisputed evidence disclosed, and the special referee found, that the bankrupts published two financial statements which were materially false, and that credit was extended to the bankrupt firm on the basis of such statements. These facts would naturally bar the

confirmation of the composition offer under the provisions of sections 12d and 14b(3), 11 USCA §§ 30(d), 32(b)(3), of the Bankruptcy Act; but the special referee held that there was no evidence to warrant the finding that the bankrupts had knowledge of the fact that the statements were false and fraudulent, or that they connived in the preparation thereof, or that they had a conscious intention to deceive prospective creditors when the statements were issued, and that therefore the composition should be confirmed.

In arriving at this conclusion, neither the referee nor the court below had before them the opinion of the Supreme Court in the case of Morimura, Arai & Co. v. Taback Bros., 49 S. Ct. 212, 73 L. Ed. ——, filed February 18, 1929, and not yet [officially] reported, holding that, where a materially false statement "was made and acquiesced in, either with actual knowledge that it was incorrect, or (2) (a) with reckless indifference to actual facts, without examining the available source of knowledge which lay at hand, and (b) with no reasonable ground to believe that it was in fact correct," it would bar a discharge under section 12 of the Bankruptcy Act."

■ We have read the testimony taken before the special referee in the light of the opinion of the Supreme Court in Morimura v. Taback Bros., supra, and find that the evidence clearly establishes that, even if the bankrupts did not know that the statements signed by them were false, they acted with such reckless indifference to the actual facts, without any examination of available sources of information, that a discharge would be barred to them.

It clearly appears by the evidence, and the referee found, that the bankrupt Nathan Gitnig prepared and signed a false financial statement, which was sent to R. C. Dun & Co. under date of January 14, 1927, purporting to state the financial condition of the firm as of January 6, 1927; that the bankrupt David Gitnig prepared and signed a false financial statement, which was forwarded to Meinhard & Co. under date of January 24, 1927, which also purported to state the financial condition of the firm as of January 6, 1927, signed the name of the firm "per N. Gitnig," his brother and partner, and also his own name as a witness. The evidence further shows that these two financial statements were false in the following particulars: (1) They showed a net worth of $50,249.20, when the books only dis-

closed a net worth of $20,998.51, or a discrepancy between the statements and the books of $29,250.69; (2) the books showed liabilities on notes to merchandise creditors in the sum of $18,067.20, which item was entirely omitted from the statements; (3) the books show liabilities to merchandise creditors on open account of $26,665.42, whereas the statement only discloses that item at $21,791.93; (4) there were notes payable to friends and relations in the sum of $6,300, which item was entirely omitted from the statement; and (5) in the statement to Morton H. Meinhard & Co. the signer thereof certified, among other things: "The facts and figures contained in this statement have been compared by the undersigned with the entries in our [my] said books and they are true and accurate to the personal knowledge of the undersigned."

It further appears that, at the time these statements issued, the firm was composed of Joseph Gitnig and his two sons, the bankrupts, David Gitnig, aged 33, and Nathan Gitnig, aged 29. Joseph Gitnig died, and his surviving partners, the bankrupts, carried on the firm as before, till the petition in bankruptcy was filed.

Joseph Gitnig, in his lifetime, was in general charge of the business of the firm. David was the buyer for the firm, and had charge of its manufacturing. Nathan was a salesman, and spent considerable time away from the office. Both David and Nathan had a general knowledge of the business of the firm, and knew that the firm was somewhat pressed for funds; they knew that money had been borrowed from relatives and friends, among them their sister Sophia, who also kept the books of the firm and was present at the time the financial statements here involved were made out.

It further appears that the father, Joseph Gitnig, was a domineering and dictatorial man, who directed his two sons to execute the statements, dictating the figures to be inserted.

These facts the referee was of the opinion excused the sons from the legal consequences of signing and issuing these admittedly false statements, on which credit was obtained by the firm. In this the referee was sustained by the court below.

■ We cannot, however, concur in this conclusion. The conduct of these bankrupts showed such an utter recklessness and indifference to the facts of the case that they ought not to be permitted to hide behind their dead father. They both admitted that

they made no examination of the books of the firm which were at hand. David certified that he had compared the statement with the books of the firm, when he had not done so. He signed his brother's name to the statement. Nathan testified that he went over the statement, item by item; that he knew in a general way of money borrowed from relatives, including his sister, who, he testified, had entire charge of the books; that he made no inquiry, even from her, when she was present at the signing of the statement. The books were at hand, and might have been examined by either of them.

It follows, therefore, that the specification of objection based on these written statements should have been sustained, and that the bankrupt's application for confirmation should have been denied. The disposition of this specification makes it unnecessary to pass on the specification of objection that the proposed composition was not for the best interest of creditors; for, even if we were to agree with the court below as to this item of objection, it would not change the result.

The decree of confirmation will be reversed, and the case remanded to the District Court, with instructions to enter a decree sustaining the specification of objection to the confirmation of the composition relating to the written statements.