## In re STRAUSS.
### No. 20892.

District Court, E. D. New York.
Oct. 26, 1933.

Strongin & Hertz, of Brooklyn (Milton Hertz, of Brooklyn, of counsel), for Nathan Strauss.

Breed, Abbott & Morgan, of New York City (William L. Hanaway of New York City, of counsel), for Underwriters Trust Co.

Kerfoot & MacArthur, of New York City (Callan Moroney, of New York City, of counsel), for Brooklyn Nat. Bank.

INCH, District Judge.

On August 7, 1931, an involuntary petition was filed against the bankrupt and on the 24th day of August, 1931, he was duly adjudicated.

His schedules, filed November 8, 1931, show liabilities: Secured claims $496,783. Unsecured claims $208,424.82. Notes and bills which ought to be paid by other parties $52,945.51. Accommodation paper $202,-751.66, making a total of $960,904.99, while his assets are stated as real estate, value unknown, cash on hand none, debts due $85,-653.58, stock bonds, etc., value unknown, deposit in bank $76.71, property claimed to be exempt $250, making a total of $85,980.29.

On or about April 22, 1932, the bankrupt's petition for discharge came before the court and specifications of objections were duly filed by certain bank creditors.

The trustee of the bankrupt's estate was duly authorized by the creditors to object to the discharge, but, beyond noting his appearance in opposition seems to have relied upon the specifications filed by others.

The specifications were duly referred to a referee and proof was taken by him. Several witnesses were presented by the banks, including the introduction of documentary evidence. The bankrupt likewise was a witness.

The learned referee has dismissed the specifications of objection and recommended the bankrupt's discharge.

Most of the material facts appear not to be disputed.

In view of the long experience of the referee, I would hesitate to disagree with his conclusions were it not that the consideration of these undisputed facts results, in my opinion, in conclusions contrary to those held by him.

I need only consider one of the specifications of objection filed by the Underwriters Trust Company.

This specification is predicated upon section 14b, subdivision 3 of the Bankruptcy Act, as amended in 1926, 44 Stat. 663, § 6, 11 USCA § 32 (b) (3).

Under this section the bankrupt must be denied his discharge if the evidence shows that he "obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing, or causing to be made or published, in any manner whatsoever, a materially false statement in writing respecting his financial condition." It is also provided under the amended act (section 14b (7), 11 USCA § 32 (b) (7), and pursuant to the proviso therein contained, a creditor has the burden of showing to the satisfaction of the court that "there are reasonable grounds for believing that the bankrupt has committed" this act complained of, and, having done so, "then the burden of proving that he has not committed any of such acts shall be upon the bankrupt." In re Tobias (D. C.) 49 F.(2d) 651.

This creditor claims that on February 13, 1931, the bankrupt signed and gave to this bank creditor a written statement, which was materially false, purporting to set forth his assets and liabilities. This statement is as follows:

FINANCIAL STATEMENT
NATHAN STRAUSS
February 2, 1931.

| Assets: | | |
|---|---|---|
| Cash in Banks | | $ 49,500.00 |
| Accounts Receivable | | 79,300.00 |
| *74,400 Shares Nathan Strauss, Inc., Stock at $9 | $669,600.00 | |
| 100 Nathan Strauss 6% 10 yr. Con. Bonds | 60,000.00 | |
| Other Securities | 310,500.00 | |
| | | 1,040,100.00 |
| Real Estate Equity | | 1,574,500.00 |
| | | $2,743,400.00 |
| Liabilities: | | |
| Notes Payable | | 59,000.00 |
| Net Worth | | 2,684,400.00 |
| | | $2,743,400.00 |

| Real Estate Schedule: Net Equity: | |
|---|---|
| 37 Nevins St., Brooklyn, N. Y. | 60,000.00 |
| 383–385 Bridge St., Brooklyn, N. Y. | 50,000.00 |
| 455 Atlantic Ave., Brooklyn, N. Y. | 25,000.00 |
| 524 Carlton Ave., Brooklyn, N. Y. | 10,000.00 |
| Flushing Acreage | 250,000.00 |
| Elton Ave., Brooklyn, N. Y. | 6,000.00 |
| 24–165 Puntine St., Jamaica, N. Y. | 12,000.00 |
| 99 Water Street, Stapleton, S. I. | 45,000.00 |
| 114–10 Liberty Ave., Richmond Hill, N. Y. | 15,000.00 |
| 3¼ acres, Flushing, N. Y. | 10,000.00 |
| 228 Livingston St., Brooklyn, N. Y. | 45,000.00 |
| 119 Willoughby St., Brooklyn, N. Y. | 15,000.00 |
| 189 Duffield St., Brooklyn, N. Y. | 12,000.00 |
| 191 Duffield St., Brooklyn, N. Y. | 7,500.00 |
| 626–628 Pacific St., Brooklyn, N. Y. | 30,000.00 |
| 79 Bond St., Brooklyn, N. Y. | 12,000.00 |
| 245 Bergen St., Brooklyn, N. Y. | 10,000.00 |
| Cash paid for Leasehold (to run 48 yrs) 426 Fulton St., Jamaica, N. Y. | 220,000.00 |
| Cash paid for Leasehold (to run 44 yrs) 569 Fulton Street, Brooklyn, N. Y. | 200,000.00 |
| Garage Property-Puntine St., Jamaica, N. Y. | 40,000.00 |
| Emmons Ave., Sheepshead Bay, N. Y. | 100,000.00 |
| 571 Fulton St., Brooklyn, N. Y., Leasehold | 400,000.00 |
| | $1,574,500.00 |

*Majority Stock of Nathan Strauss, Inc.

Nathan Strauss

February 13, 1931.

Exhibit A

812

The reason for the making and the giving of the above statement was as follows:

During the year 1929 this bank had personally loaned the bankrupt $40,000 taking his promissory note, unsecured. This loan had been on the books since that time and had been reduced from time to time so that on February 2, 1931, it had been reduced to $21,000 and was due on that date.

During the month of January, 1931, the bank, knowing that this note would soon become due, requested the bankrupt to "furnish the bank with an up-to-date financial statement." The bankrupt did not comply at that time but promised to do so.

When February 2, 1931, arrived, the note was not renewed by the bank. The bankrupt then attempted to renew it by sending a new note for $20,000 together with a check for $1,100 representing interest and a payment on account. He was told, however, by the bank officials that this "could not be accepted until the statement was given." The proposed renewal note for $20,000 was returned to him.

Accordingly, on or about February 13, 1931, the bankrupt made and presented to the bank the financial statement above set forth.

An officer of the bank testified that after receiving this statement he gave instructions that the note be renewed. That he made this order based on what "he had observed in the statement and noting the statement of assets and liabilities contained therein."

There is sufficient evidence in the record, unexplained, to show that, therefore, this renewal or credit was extended to the bankrupt because of the financial statement.

Later, on April 3, 1931, the bankrupt paid $500, on May 13, $1,500, and on July 2, 1931, about a month before his bankruptcy, $500. The loan remaining unpaid, at the time of the bankruptcy, was $13,500. At this time the bankrupt had less than $100 on deposit in the bank.

No new statement was furnished after February 13, 1931. Gerdes v. Lustgarten, 266 U. S. 321, 45 S. Ct. 107, 69 L. Ed. 309.

■ The burden of making a prima facie case, under the statute, rested upon the creditor. In re Wolff (D. C.) 11 F.(2d) 293.

■ It was not sufficient, to make a prima facie case, simply to show some error or omission in the statement, but facts must also be shown sufficient to reasonably indicate directly or by reasonable inference, unrebutted, that material error or omission was made in the statement and that it was intentionally and knowingly false. In re Kerner (C. C. A.) 250 F. 993; In re Smith (D. C.) 232 F. 248.

The learned referee has found that while the statement was untrue, it was not false. He also finds that it did not mislead the bank.

Because of this fact, it has become necessary to carefully examine all the testimony before the referee in order to see whether or not there is some evidence to support such findings.

In the first place there is no dispute that the statement was signed and delivered by the bankrupt and that it purports to relate to his personal liabilities and assets.

The loan and note were his personally.

It would also seem to be plainly shown that credit was extended on and because of the statement.

In fact, counsel for bankrupt, at the close of the hearing, stated, "Yes, I think the testimony is by one of the officials of the Underwriters Trust Company that they extended credit or extended the loans on the basis of the statement. There is no question about it." The referee then stated that that "phase of it is eliminated from further discussion."

The bankrupt started in the meat business thirty-five years ago, commencing with a single store. The corporations formed by him accumulated several chains of such stores until he had approximately 224 stores. He testifies: "I worked that business up myself, without owing anybody a dollar, until this misfortune happened in 1929 and everything I had went to pieces."

He thus started with a single store and later formed a corporation Nathan Strauss, Inc., of which he had control and was president. In 1928 this corporation had 100 stores. Later he acquired another chain of stores called the Strauss-Roth, Inc., of which he also had control, and became president. He also speculated in real estate to a large extent and states that he was interested in approximately forty parcels.

It is evident from the record that this business had expanded rapidly. It required the repeated borrowing of large sums of money, represented by personal loans, indorsement of notes, and the making of notes with other comakers. When the depression arrived, the whole structure collapsed.

The bankrupt testified that he became "very nervous" because of the constant demands and financial worries of keeping this

business afloat with a steadily increasing storm of financial depression.

It is unnecessary to recite all the details of these efforts on his part, as shown by the record, except to thus refer to them in connection with the obtaining of this renewal of the note in question, which, plainly, was but an incident in his energetic efforts to keep going until better times arrived and to avoid a suit and possible judgment which would have precipitated a crash which he hoped to avert. It was plainly important to him that every creditor be satisfied.

As we are discussing the question of·a prima facie case, such intention or motive appears a reasonable inference in the absence of any evidence to rebut it.

The bankrupt testified: "I did not keep any books. That Mr. Rosenthal looked·after them." He further states: "I looked to Mr. Rosenthal most of the time to take care of them for me. I don't think I wrote ten checks in my life. Of course, I am a little handicapped in good writing therefore I never use my own writing."

Taking into consideration the large amount of business being done by his companies, this is not at all unreasonable so far as mere entries affecting the business is concerned. In re Sugarman (D. C.) 3 F. Supp. 502, 23 A. B. R. (N. S.) 184; In re Stafford (D. C.) 226 F. 127.

■ But, in the case before me we are not dealing with company assets or liabilities, we are dealing with the bankrupt's personal obligations and personal assets. These are facts, which, in the absence of proof to the contrary, he must be presumed to know. In re Savarese (C. C. A.) 209 F. 830. A mere reliance on a bookkeeper under such circumstances would not suffice.

Moreover, the bankrupt testified: "I instructed Mr. Rosenthal to prepare the statement. I had a conversation with Mr. Rosenthal when he had the statement prepared." This shows that his attention was called to the statement before it was presented to the bank.

Consequently, this was not a case of inadvertence but a matter apparently of some deliberation. The bankrupt further testified: "We had about fifty statements to sign; we are sending out statements every day for Strauss, Inc., and Strauss-Roth, Inc." Showing that bankrupt was familiar with financial statements and with their purposes.

However, in answer to his counsel, bankrupt testified in regard to this statement "I

felt it was true, I did not intend to mislead, mis-state or over estimate or make a false statement in connection with my financial transaction. I know I was worth that much and in fact more in 1930. In 1931 my assets depreciated some. I think this statement is absolutely true because in my estimation I was worth three times that much."

The above constitutes practically the explanation of the bankrupt which seems to be that he did not intend to mislead for he was, in his opinion, worth so much more than he owed, that the creditor bank could not possibly have been misled. That he thought the statement to be true.

This view has apparently been followed by the learned referee who says: "I do not believe that the inclusion or the failure to include these obligations would have made any difference. I do not believe that the failure of the bankrupt to list his secured or contingent obligations made this a 'material false statement.'"

■ The learned referee finds, however, that "none of the real estate listed under the 'Real Estate Schedule'' was personally owned by the bankrupt." He finds that "these properties were owned by corporations in which the bankrupt owned a stock interest." "The values were predicated upon an appraisal, in the main, made by one Joseph M. May, in or about 1929, and, in some instances, on actual cost."

There are other things that could be said about this statement so far as the statement of assets is concerned, but it seems to me that an even more important question arises as to the omission of liabilities. These were personal liabilities.

In regard to this the referee reports as follows: "In the financial statement the bankrupt lists notes payable $59,000.00. The proof shows that, in addition to the note of the Underwriters Trust Company there were three other notes payable and on which bankrupt was directly responsible at the time of the making of the financial statement, the Brooklyn National Bank, $65,000.00, Brooklyn Trust Company, $45,000.00 and Brooklyn National Corporation, $42,160.49, the latter note had had eight other co-makers and was partly secured."

There were other large obligations also omitted as to which the referee finds: "These obligations consisted of about ten in number, on seven of which the bankrupt was an indorser on notes made by others and the other three were direct obligations of the bankrupt

but all of which were amply secured by collateral."

The referee, however, then goes on to say, "I do not believe that the failure of the bankrupt to list his secured or contingent obligations made this a 'materially false statement.'" There does not seem to be any such reference to the omission of the first three notes mentioned, aggregating over $150,000, except that the referee apparently decides that as one of the comakers on the Brooklyn National Corporation note of some $42,000, the bankrupt's responsibility was for only approximately $4,000, a legal conclusion which is not exactly clear to me in the absence of any evidence to that effect.

If we consider, therefore, all of the personal obligations of the bankrupt omitted, both direct and indirect, representing a maker or indorser of notes, we have a deliberate omission from the statement of almost $500,000. If we consider only his direct personal obligations, excluding the note of this objecting creditor, we have approximately almost half that sum.

It seems to me that the omission of such an amount of personal obligations, in the absence of some explanatory proof to the contrary, is material.

Moreover, the statement makes the additional affirmative statement of "net worth," which could not possibly be true.

We therefore have the following record: The bankrupt, after refusal to renew and upon request by the creditor, signed personally and delivered to the creditor what purported to be a statement of his financial condition on February 13, 1931. Credit was then extended to him and his notes renewed by the creditor after reading such statement and because of it. The statement was untrue both in regard to assets and liabilities.

■ If it was "false," a discharge must be refused. In re Weitzman (D. C.) 11 F.(2d) 897; In re Wolff (D. C.) 11 F.(2d) 293; Morton v. Snider (C. C. A.) 20 F.(2d) 469, 10 A. B. R. (N. S.) 194; In re Kerner (C. C. A.) 250 F. 993.

Reckless indifference to actual facts and with no reasonable ground to believe the statement was in fact correct is insufficient explanation. Morimura, Arai & Co. v. Taback, 279 U. S. 24–33, 49 S. Ct. 212, 73 L. Ed. 586.

Actual knowledge of falsity and conscious intent to deceive are not necessary where bankrupt made no effort to verify facts and did not inquire as to liabilities which he knew

were omitted. Woolen Corp. of America v. Gitnig (C. C. A.) 33 F.(2d) 259, 14 A: B. R. (N. S.) 324; In re Perlmutter (D.. C.) 256 F. 862; In re Smith (D. C.) 232 F. 248.

The referee has found as follows: "While a reading of the statement might lead one to believe that the bankrupt owned the whole property, yet it does not so set forth."

With this finding by the referee one might inquire just why any detailed statement was given? If the bankrupt's position is correct, all he needed to do was to give a statement of "net worth." He plainly knew this would not be sufficient and so itemized to some extent his assets and liabilities. When he did this, certainly he should have set forth the truth. His failure to do so needs explanation, and, so far as I can see, none was given.

This was not a case where the facts showed immaterial omissions as in Bolles v. Kelley (C. C. A.) 222 F. 63; In re Rosenfeld (C. C. A.) 262 F. 876 (see dissent of Judge Hough); In re Hargrove (D. C.) 55 F.(2d) 996; Morris Plan Bank v. Henderson (D. C.) 57 F.(2d) 326.

Nor a case where the liabilities were correctly totaled but not itemized. In re Little (C. C. A.) 65 F.(2d) 777.

The referee has found that he did not personally own the real estate although one might think from the statement that he did. In re McGillis (C. C. A.) 40 F.(2d) 268; Swift & Co. v. Fortune (C. C. A.) 287 F. 491; In re Ratner (D. C.) 2 F. Supp. 530; In re Kellerman (D. C.) 2 F. Supp. 520; In re Simon (D. C.) 268 F. 1006.

He omitted material personal obligations and stated "net worth." In re Maaget (D. C.) 245 F. 804; In re Trimble (C. C. A.) 55 F.(2d) 165.

As Judge Coxe says in Josephs v. Powell & Campbell (C. C. A. 2) 213 F. 627, 628: "Were not those who were asked to extend credit to the bankrupt entitled to know that he owed $12,000 to his relatives?"

There is no proof in the record, that I can find, that the bank knew of these omitted obligations or that they knew sufficient facts as to the assets to justify the inference that such statement of assets or omissions were immaterial and that the credit would have been extended in any event.

This being so, the creditor made out a case, which, being unrebutted, requires a denial of the discharge.

The motion to confirm is denied and the discharge denied.