In the Matter of Robert DE GLOPPER, Bankrupt.

No. 12280.

United States District Court
W. D. Michigan, S. D.
Feb. 10, 1956.

Dilley & Dilley and Robert W. Dilley, Grand Rapids, Mich., for bankrupt and appellant.

Rosemary Scott, Grand Rapids, Mich., for objecting creditors and appellees.

STARR, Chief Judge.

On June 21, 1954, Robert DeGlopper filed a voluntary petition in bankruptcy and was adjudged a bankrupt. In schedule A–3 of his petition he listed as unsecured creditors "Orval and Doris Idema, * * * $3,458.75." It appears that the Idemas' claim was based on a judgment which they had obtained against the bankrupt in the circuit court of Kent county, Michigan, on May 21, 1954.

In the course of the administration of the bankrupt's estate, the Idemas, whose judgment claim had been allowed, filed objections to the bankrupt's discharge. The bankrupt then moved to dismiss the objections, and a hearing was had and testimony taken before the referee. In his findings the referee determined that on May 10, 1954, the bankrupt had obtained money on credit and an extension or renewal of credit from the Union Bank of Michigan by making a materially false statement in writing respecting his financial condition.[1] On April 8, 1955, in pursuance of section 14, sub. c (3) of the Bankruptcy Act, 11 U.S.C.A. § 32, sub. c(3), the referee entered an order denying the bankrupt's discharge. Said section 14, sub. c(3) provides:

"The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition: * * * *Provided*, That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this subdivision, would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt."

The bankrupt has filed a petition for review of the referee's order, and the precise question before this court is whether the bankrupt obtained money on credit and an extension or renewal of credit, by making or causing to be made a materially false statement in writing to the Union bank respecting his financial condition. In considering this question the court should accept the referee's findings of fact unless clearly erroneous. See General Order 47, 11 U.S.C.A. following section 53; also Kansas Federal Credit Union v. Niemeier, 10 Cir., 227 F.2d 287; Gold v. Gerson, 9 Cir., 225 F. 2d 859, 860; In re Garden City Brewery, Inc., 7 Cir., 208 F.2d 377, 379; In re Skrentny, 7 Cir., 199 F.2d 488, 492.

In support of their objection to the bankrupt's discharge the Idemas contend that his application to the Union bank for a loan on May 10, 1954, was materially false as to his financial condition because (1) he failed to disclose in his application the pendency of a suit the Idemas had instituted against him in the circuit court of Kent county, Michigan, for damages in connection with his construction of their house, and (2) be-

1. Other objections to the bankrupt's discharge were overruled and dismissed by the referee and no appeal taken therefrom.

cause he failed to disclose in his application information regarding sums of money which his mother in her lifetime had advanced to him in connection with the building of his home.

It appears from the pleadings, exhibits, and the transcript of testimony taken before the referee, that on May 10, 1954, the bankrupt had applied to the Union Bank of Michigan in Grand Rapids for a loan of $726.90; that $259.80 of this amount was the refinancing of an existing loan and that the balance of the loan, aside from interest and service charges, was to be used by the bankrupt in connection with the funeral and burial of his mother and for the payment of his attorney. It appears that on that date, May 10th, the bankrupt and his wife went to the Union bank and were interviewed by Walter Makowski, the bank's loan officer; that the loan officer in his own handwriting filled out the bank's regular blank form of loan application (exhibit D), and that he obtained the information which he inserted in the application by questioning the bankrupt. The loan application was then signed by the bankrupt and his wife. It should be specially noted that the space on the application form following the printed statement, "give full list of present creditors," was left blank by the loan officer. Loan officer Makowski testified regarding the questions he asked the bankrupt as follows:

"Q. From what source did you get the information that you put on that blank? A. Question and answer type in a discussion with Mr. DeGlopper.

"Q. Looking at the application blank, did you ask him concerning any obligations that he had? * * A. That I cannot recall at the present time. The purpose of the loan was for funeral expenses, and that is the extent of it.

"Q. From your records, can you tell me if Mr. DeGlopper had a prior obligation that was incorporated in this loan? A. Yes, he had a previous loan that had an unpaid balance at the time that we refinanced the account.

"Q. What was the amount of the unpaid balance at that time? A. $259.80. * * *

"As far as I am concerned, Mr. DeGlopper received the proceeds of this loan in cash in the amount of $375. * * *

"Q. Would it have made any difference in your judgment as to whether the loan should be granted if you had known that part of the money was for attorney's fees and part was for funeral expenses? A. * * * No, it wouldn't have made a great deal of difference because Mr. DeGlopper, financially speaking, was very sound, and he had a very excellent record with us. * * *

"Q. Do you have any recollection at the present time that you asked him about obligations other than time-payment obligations? A. No, I can't recall at the present time. The information that is on the application is about the only thing that I can recall. * * *

"Q. Well, in any event, the only question you asked about obligations was time-payment obligations, is that right? A. To my knowledge, yes.

"Q. Had Mr. DeGlopper met all the payments due on this loan as they came due? A. Very satisfactorily. * * *

"The Referee: What in the bank's terminology does, 'Give full list of present creditors' mean? A. Ordinarily it is a duplication of what we have on the reverse side of the application, which takes into consideration the mortgage payments on the home and the monthly instalments that the customer may be making payments on.

"The Referee: Then had you known that there were these other two indebtedness items that Miss Scott (attorney for the Idemas) called attention to, at least one of

them was an indebtedness, and one was a potential indebtedness, would they normally have been imbedded in this financial statement? A. They should have been, sir. * * *

"The Referee: Did you ask about anything except the time-payment obligations as you stated to Mr. Dilley? A. Well, as I said before, to qualify my statement I cannot be sure at the present time whether I asked him what his obligations were or what his monthly obligations were. * * *

"The Referee: What would have been the result of your conclusion as to whether or not this loan would have been made had the two items of indebtedness, the one fixed, and the other potential, that we have talked about appeared upon this statement; would it have made any difference in your judgment? A. Yes, it definitely would have. I mean it would have disqualified proceeding with the loan until such time as the situation was straightened out. * *

"Q. * * * Do I understand correctly that you have no recollection of what question you asked DeGlopper about his obligations on this occasion? A. Truthfully, no."

Martin Johnson, an assistant cashier and loan officer of the Union bank, testified as follows:

"Q. Will you describe how you came in contact with Mr. DeGlopper if you recall on or about May 10, 1954? A. Well, the indications are that we received a phone call, one of the secretaries obtained information from our file and from that I made a note which I put in a pending file tentatively approving the loan subject to complete application.

"Q. Did you give that information to the gentleman (Mr. Walter Makowski, loan officer), who has just testified? A. This information was available in the pending file to any loan officer who might have

waited on Mr. and Mrs. DeGlopper when they came into the bank."

The bankrupt DeGlopper testified:

"Q. I asked you if you were aware on May 10, 1954, on the date you made this loan from the Union bank that you knew that there was pending a law suit that had been tried in the Kent county circuit court in which damages had been asked by Mr. and Mrs. Orval Idema in the sum minimum of $3,800 to $4,500 that you had been paid? A. Well, that has got to do with the bank. Sure, I was aware of it. If you want your answer there, yes. * * *

"The Referee: The question is, whether or not you knew at the time you gave the note to the bank that there was such a suit pending in the circuit court; did you know it? A. Yes. * * *

"Q. You knew at the time you signed this (application for loan) that you did have present creditors, did you not, yes or no? A. I didn't recall any that I had.

"Q. You have just testified that you knew you owed Mr. Dilley (his attorney)? A. This money was borrowed to pay Mr. Dilley and the funeral expenses. * * *

"Q. You knew when you signed that that didn't contain all of your obligations, didn't you? A. Well, it never entered my mind; it was the present obligations that we were interested in.

"Q. Then you signed this without really thinking about the matter? A. Broadly speaking, I suppose that is correct. * * *

"Q. Were you asked by the bank officials whether or not you had any other obligations? A. I don't recall whether they asked me or not. * * *

"Q. Did this representative (loan officer of the bank) ask you questions to produce the information

that appears in this (loan application) statement? A. * * * I was interviewed by two different parties at the bank.

"Q. In connection with this statement? A. Yes. * * *

"Q. Well, did either of these gentlemen ask you any questions about bills or debts that you owed? A. No, not that I can recall. * *

"I don't recall their asking me anything except the mortgage they hold on the loan.

"Q. Did they ask you any question about whether you owed any time-payment obligations except this one on your car? A. They asked me if I had any charge accounts like accounts at Herpolsheimer's or Wurzburg's and things like that which I don't have."

The testimony in this matter indicates that the bankrupt had at one time been in the building contracting business, that he had built a house for the Idemas, and that as a result of disputes relative to the construction of the house and as to payments made therefor, the Idemas in 1953 had begun a suit against him for damages in the circuit court of Kent county, Michigan. It appears that such suit had been tried but no decision rendered therein at the time the bankrupt made his application to the Union bank for a loan on May 10, 1954. It further appears that on May 21, 1954, subsequent to the bankrupt's application to the bank for the above-mentioned loan, a judgment was rendered in the circuit court suit in favor of the Idemas and against the bankrupt for damages and court costs in the aggregate amount of $3,458.75. As hereinbefore stated, the Idemas contend that the bankrupt's application to the bank on May 10th was materially false in that it did not disclose the pendency of their circuit court action against him.

The Idemas further contend that the bankrupt's application was materially false in that it did not disclose information regarding sums of money his mother had advanced to him in her lifetime. It appears that several years prior to the bankrupt's application to the Union bank on May 10, 1954, his mother had from time to time advanced him sums of money aggregating about $2,970 for the purpose of paying bills and expenses in connection with the building of his home. No promissory note or other written evidence of indebtedness for such advances was ever executed by the bankrupt to his mother, and there is no evidence or showing as to when, if ever, the bankrupt was to repay these advances. The only evidence relating to these advances by the mother is that of the bankrupt, who testified as follows:

"Q. Did you have any obligations at that time (May 10, 1954) you made that loan? A. Yes, I had to pay a couple of bills. * * * To pay Mr. Dilley (his attorney), and a portion of my mother's funeral expenses. * * *

"Q. And you knew that at that time you owed your mother's estate $4,970 (should be $2,970) that had not been repaid? A. No. * * *

"Q. And that it had been loaned to you? A. Let's not put that as a loan, in other words, mother said when I needed the money to pay the bills to come and see her. There was no formal agreement made as to borrowing this money between her and I.

"Q. In the 21-A (bankruptcy court) examination on November 19th, did you state as follows in answers to questions in reference to the house that you now live in: 'Now how did you pay for the excavating that was done? A. My mother made some advances.

" 'Q. Did she make you advances in one lump sum? A. No, small portions.

" 'Q. Do you have any record of those advances? A. No.

" 'Q. Did you sign any agreement to repay them? A. Not as yet.

" 'Q. Is your mother deceased? A. Yes.

" 'Q. Is there a pending probate of her estate? A. I am not aware that there is.' * * *

"Q. Did you make answers as I have read? A. Yes, that is true. * * *

"Q. You did have an agreement to repay these funds, did you not? A. The agreement was this, when mother had helped other members of the family out, she didn't pull any punches, you might say, when it came to helping us out.

"Q. But there was an agreement to repay this? A. Yes, we agreed to repay it back. * * *

"Q. How long ago did you get this money from your mother that went into your residence? A. Probably five or six years ago. * *

"Q. After you got it, did she ever make any demand on you to pay it back? A. No. * * *

"Q. You say that you never signed any note or other evidence of indebtedness to your mother? A. That is right. * * *

"The Referee: Is there any question but that on May 10, 1954, you had received from your mother the total in advancements of $2,970? A. Well, that money had all been received before that. * * *

"The Referee: Is there any question that on May 10, 1954, you knew you had received the sums from your mother? A. I knew it, yes, I knew that I owed her that money, yes."

The important question in this case is whether the bankrupt's written application to the Union bank for a loan on May 10, 1954, was "materially false" within the meaning of section 14 of the Bankruptcy Act by reason of the fact that the bankrupt failed to disclose in the application the fact that a suit for damages instituted by the Idemas against him was pending in the circuit court of Kent county, and also failed to disclose information as to the advances his moth-

er had previously made to him. This question must be determined in accordance with the well-established law as applied to the particular facts and circumstances of this case—not on the ground of any prejudice or distaste the bankrupt's attitude and appearance on the witness stand may have engendered.

The rule is well recognized that to constitute a written statement "materially false" within the meaning of section 14 of the Bankruptcy Act, there must be proof of an intent to defraud and deceive, and that the statement must have been knowingly or intentionally untrue, to bar a discharge. In 1 Collier on Bankruptcy, 14th Ed., § 14.40, pp. 1370–1374, it is stated:

"It has been held that an intent to defraud is essential; the word 'false' means more than erroneous or untrue and imports an intention to deceive, and a materially false statement in writing must have been knowingly or intentionally untrue to bar a discharge. Intention to deceive is always material as an element of proof, and, by the weight of authority, such intent is an essential element. * * * If a debtor was misled into signing the statement by the creditor's agent, who filled it out and gave it to the debtor to sign, leaving certain blanks unfilled, the element of intention is lacking, and the debtor's discharge is not barred."

In 7 Remington on Bankruptcy, 5th Ed., § 3327, pp. 575–581, it is stated:

"It is an essential element of this bar to discharge that the statement made must have been materially false. * * *

" 'False,' in this connection means more than merely 'untrue' or 'incorrect,' it implies guilty knowledge and intentional deceit. * * *

"The false statement in writing which is enough to deny a discharge implies a statement knowingly false or made recklessly without an honest belief in its truth and with a pur-

pose to mislead or deceive and thereby obtain from the person to whom it was made, property upon credit.
\* \* \*

"Falsity cannot be predicated of an omission to state: there must be a statement, a positive assertion, that is false."

In 8 C.J.S., Bankruptcy, § 521, p. 1428 et seq., it is stated:

"The written statement relied on to bar a discharge must be not merely untrue, but must be shown to be intentionally or knowingly so. Stated otherwise, all other factors being present, a discharge will be denied if, but not unless, the statement relied on as false was made with knowledge of its falsity and an intention to mislead, or was so recklessly made as to warrant an imputation of fraud or intent to mislead or deceive. To defeat a discharge on the ground that a bankrupt omitted obligations from his statement, it is necessary to show, either expressly or impliedly, that he knew the obligations existed and could be enforced against him."

In Hartsfield Co. v. Smith, 5 Cir., 61 F.2d 723, 724, the court in granting the bankrupt a discharge said in part:

"It is not sufficient that the 'materially false statement,' referred to in the section of the Bankruptcy Act under consideration, is untrue, erroneous, or mistaken; such statement, in order to constitute a bar to the discharge of the bankrupt, must be false in the sense that it is intentionally untrue. Gilpin v. Merchants' Nat. Bank, 3 Cir., 165 F. 607, 20 L.R.A.,N.S., 1023; Franklin v. Monning Dry Goods Co., 5 Cir., 217 F. 929; In re Rosenfeld, 2 Cir., 262 F. 876; In re Matthews, 7 Cir., 272 F. 263; Farmers' Savings Bank v. Allen, 8 Cir., 41 F.2d 208. \* \* \*

"That statement on its face was incomplete, in that it did not state in the blanks provided for the purpose the price paid for the real estate, or the amount of the mortgage indebtedness that was against it. And the statement of total indebtedness excluded the mortgage indebtedness. \* \* \* *Appellant accepted the bankrupt's representations without requiring the complete statement called for by the form which it furnished.* Manifestly it could not know the net worth of the real estate without knowledge of its value or of the incumbrances upon it. It therefore was advised that the bankrupt's representation of his net worth was at best an estimate. The bankrupt's representation that he was liable as an indorser for $500, whereas the proof showed he was so liable for $1,000, can as well be attributed to an honest mistake as to a deliberately false statement."

See also Schapiro v. Tweedie Footwear Corporation, 3 Cir., 131 F.2d 876, 878; Third Nat. Bank v. Schatten, 6 Cir., 81 F.2d 538, 540; Baash-Ross Tool Co. v. Stephens, 9 Cir., 73 F.2d 902, 905; In re Axel, D.C., 103 F.Supp. 810, affirmed Axel v. Industrial Bank, 2 Cir., 196 F.2d 217; In re Barnhart, D.C., 91 F.Supp. 453; In re Venturella, D.C., 25 F.Supp. 332, affirmed 2 Cir., 102 F.2d 1022.

The question as to whether a written application for a loan or credit is materially false within the meaning of section 14 of the Bankruptcy Act must be determined on the basis of the particular facts and circumstances in each case. In the present case there are certain significant facts which should be kept in mind: (1) That the printed form of written application to the Union bank for a loan on May 10, 1954, was not filled out by the bankrupt; (2) that the application was in fact filled out by the loan officer of the bank from information he obtained by questioning the bankrupt; (3) that the space on the application form immediately following the words, "give full list of present creditors," was left blank by the bank's loan officer; (4) that there is no proof or showing that the loan officer questioned the bankrupt as to his having obligations or indebtedness

other than instalment payments; (5) that on the reverse side of the application, in answer to the question, "Are you making instalment payments? To whom?" the bankrupt correctly answered, "None"; (6) that the loan officer testified that he did not recall questioning the bankrupt as to any other indebtedness or obligations; (7) that in 1953 the Idemas had begun a suit for damages against the bankrupt in the circuit court of Kent county; that the bankrupt had denied liability to the Idemas and had employed counsel to defend him in that suit; that a trial was had in circuit court but no decision had been rendered prior to the time the bankrupt applied to the Union bank for the loan on May 10th; (8) that on May 21st, subsequent to his applying for the loan, a judgment was rendered in favor of the Idemas and against him in the circuit court action; (9) that the advances which the bankrupt's mother had made to him from time to time several years prior to May 10, 1954, were not evidenced by any promissory note or other evidence of indebtedness; (10) that there was no agreement or understanding between the bankrupt and his mother as to when, if ever, such advances were to be repaid to her; (11) that the mother had not requested him to repay such advances; (12) that it appears that the mother had made advances to other members of her family; (13) that the amount advanced by the mother was not listed as a liability in his schedules in bankruptcy; and (14) that the Union bank did not object to the bankrupt's discharge.

From the testimony in the present case it appears that the bank's loan officer filled out the loan application, leaving blank the space following the words, "give full list of present creditors," and then handed it to the bankrupt for signature. The bankrupt could reasonably have expected the bank's loan officer to ask him such questions and obtain such information as the bank desired, and he could reasonably have assumed that the loan officer by questioning him obtained all the information the bank wanted.

There is no showing that the bankrupt failed to answer any questions or furnish any information the loan officer requested. In 1 Collier on Bankruptcy, 14th Ed., § 14.40, page 1374, it is stated: "If a debtor was misled into signing the statement by the creditor's agent, who filled it out and gave it to the debtor to sign, leaving certain blanks unfilled, the element of intention is lacking, and the debtor's discharge is not barred." Furthermore, it seems obvious that the bank did not make the loan to the bankrupt in entire reliance on his application, as the loan officer testified that "Mr. DeGlopper, financially speaking, was very sound and he had a very excellent record with us," and that he had made all payments on the loan as they came due.

The law is well established that an intent to deceive and defraud and to make a false statement cannot be inferred from the fact that a space in a financial statement is left blank. In other words, the blank space in the loan application here in question cannot be construed as a fraudulent representation by the bankrupt that he had no "present creditors." The most recent decision determining the question as to the effect of a blank space in a bankrupt's application for a loan or credit is Kansas Federal Credit Union v. Niemeier, 10 Cir., 1955, 227 F.2d 287. In that case a creditor objected to the bankrupt's discharge on the ground that he had made a materially false financial statement upon which credit had been extended. In affirming the district court's discharge of the bankrupt, the appellate court said, 227 F.2d at page 290:

"The most serious question is with respect to the financial statement submitted to the appellant when the bankrupt obtained his loan from it. It is claimed that this statement is false in two respects; that therein the bankrupt stated that he owned 720 acres of land, and also failed to list some of his creditors, when in fact he owned no land and had two such creditors, to one of whom he owed a considerable sum. The ap-

plication statement upon which the bankrupt got the loan and which was filled out originally entirely by himself was headed as follows: 'I am indebted to the following creditors (list all debts such as doctor bills, installments, loans, etc. . . ..)' Following this statement appeared a number of lines for listing such creditors, and lines for the amount owing to each. This was left entirely blank. * * *

"With respect to the omission of the two creditors, appellant claims that the bankrupt was guilty of a material misrepresentation upon which it relied and extended the credit. The identical question upon a nearly identical financial statement was before the federal court in International Harvester Co. of America v. Carlson, 8 Cir., 1914, 217 F. 736, 739. Concerning this the court there said: 'This schedule of liabilities is left entirely blank in the statement, and it seems to be contended that because of these blanks the bankrupt states that he owed nothing that could properly come under either of these heads; whereas, in fact, the evidence shows that he was indebted in considerable sums under each head. *We do not think that an omission constitutes a "material statement," within the meaning of section 14 of the Bankruptcy Act.* There is nothing in any other part of the form which declares that blanks unfilled are to be construed as representing that nothing is owing under the heading. *A "material statement" means not a blank, nor an inference from a blank. There must be a direct statement, either negative or positive, which is false, to justify the denial of the bankrupt's discharge.'* "

In International Harvester Co. of America v. Carlson, 8 Cir., 217 F. 736, 739, the court expressly held that a space left entirely blank in a financial statement to obtain a loan or credit does not constitute a "material statement" within

the meaning of section 14 of the Bankruptcy Act, and that "A 'material statement' means not a blank, nor an inference from a blank."

In the case of In re Monaghan, D.C., 40 F.Supp. 245, the court in considering the fact that certain questions in a written loan application to a bank were not answered and were left blank, said in part:

"The bankrupt did not make any representation with respect to liabilities on previous and unpaid notes as a maker or endorser. He made no answer to the questions. The statement made by the bankrupt was not false since he did not make any representations as to the previous borrowings. *There can be no assumption that a statement is false because the questions were not answered.*"

The bankrupt had denied liability to the Idemas, and had employed counsel to represent and defend him in the suit for damages which they had instituted against him in circuit court. No decision had been rendered in that case prior to the bankrupt's application to the bank for a loan on May 10, 1954, and at that time he had the right to believe that he owed the Idemas nothing. The circuit court action was not decided and the judgment against the bankrupt was not entered until sometime subsequent to his application to the bank for the loan in question. The fact that the bankrupt did not disclose in his application to the Union bank that the objecting creditors, the Idemas, had instituted a suit against him in circuit court, did not constitute his application a "materially false statement" within the meaning of section 14 of the Bankruptcy Act. In considering the question as to whether a financial statement was "false" within the meaning of section 14 of the Bankruptcy Act because it failed to disclose the fact of a pending law suit against the bankrupt, in Baash-Ross Tool Co. v. Stephens, 9 Cir., 73 F.2d 902, 905, 906, the court said:

"Appellants place considerable stress in their briefs upon the fact that in none of the three financial

statements furnished to the objecting creditors did the bankrupt mention the fact that a suit was pending against him for a sum approximating $17,000. * * * There was no testimony or evidence introduced at the hearing which tended to show an absence of good faith on the part of the bankrupt in believing that he had a justifiable claim, nor was .any showing made which would tend to indicate that the bankrupt could have reasonably foreseen the way in which the matter would necessarily terminate in court. The bankrupt's conduct with reference to this suit which was pending seems sufficiently consistent with innocence and good faith to warrant the special master in finding that such omission was not made with the intent of falsifying his financial statements or for the purpose of defrauding his creditors. To defeat a discharge on the ground that a bankrupt omitted obligations from a financial statement made by him, it is necessary to show either expressly or impliedly that he knew the obligations existed and could be enforced against him. In re Maaget, D.C.N.Y., 245 F. 804. See, also, In re Kerner, 2 Cir., 250 F. 993."

In the case of In re Cleveland, D.C., 40 F.Supp. 343, in considering the effect of a bankrupt's failure to disclose in his written application for a loan the fact that a suit was pending against him, the late Judge Fred M. Raymond of this district said:

"The issue for determination upon the objections filed is whether the bankrupt, in omitting from his statement in writing to the objecting creditor the two claims referred to, was actuated by bad faith. In the case of Third National Bank v. Schatten, 6 Cir., 81 F.2d 538, 540, it was held that the words 'false statement in writing' within provision of Bankruptcy Act, 11 U.S.C.A. § 32, authorizing denial of discharge therefor, implies statement know-ingly false, or made recklessly without honest belief in its truth, and with purpose to mislead or deceive; 'false' meaning false in sense of being intentionally untrue. Careful review of the record made before the referee convinces the court that there was sufficient basis for bankrupt's belief that the claim of the Bishop Furniture Company had been satisfactorily adjusted so that no indebtedness remained. The court is also convinced that the referee was right in his conclusion that the omission of the alleged .claim of Northwestern Oil Products Company was not the result of a purpose to mislead or deceive. Bankrupt had repeatedly denied liability and had decided to contest the claim in court if sued. In the case of Baash-Ross Tool Co. v. Stephens, 9 Cir., 73 F.2d 902, 905, the court said: ' * * * To defeat a discharge on the ground that a bankrupt omitted obligations from a financial statement made by him, it is necessary to show either expressly or impliedly that he knew the obligations existed and could be enforced against him. In re Maaget (D.C.N.Y.) 245 F. 804. See, also, In re Kerner [2 Cir.] 250 F. 993.' See also, Hartsfield Co. v. Smith, 5 Cir., 61 F.2d 723; In re Lessler, 2 Cir., 74 F.2d 249; In re Venturella, D.C., 25 F.Supp. 332; Gilbert's Collier on Bankruptcy, Fourth Ed., sec. 489."

In considering the effect of a bankrupt's failure to include in his written application for a loan, certain creditors whose claims he disputed or did not admit, the court in the case of In re Venturella, D.C., 25 F.Supp. 332, 333, 334, said:

"A materially false statement must be one the falsity of which is known to the bankrupt, and must be made with intent to deceive. Matter of Strauss, supra [D.C., 4 F. Supp. 810]; Baash-Ross Tool Co., supra [9 Cir., 73 F.2d 902]; In re Johnson, supra [D.C., 1 F.Supp.

649]; Third National Bank v. Schatten, 6 Cir., 81 F.2d 538. Nor is the failure to disclose a matter or circumstance affecting the financial status of the debtor a ground for denying a discharge, unless such disclosure was fairly called for or implicit in the representation which, in fact, was made. Judge Swan, in this Circuit, speaking for the Circuit Court of Appeals, in Re Little, 65 F.2d 777, at the bottom of page 778, said: 'Failure to make a full and fair oral disclosure is not a ground for denying a bankrupt his discharge. There must be a false and fraudulent statement in writing.' * * *

"Furthermore, it is always possible that a person may be cognizant of the assertion of a claim against him, which he, in good faith, knows or honestly believes to be unfounded. The average man when asked to list his liabilities cannot be expected to assume that alleged claims are called for as well as recognized liabilities. If a questionnaire intends to cover mere claims,—as distinguished from conceded debts and liabilities, the questioner can resort to the very simple procedure of asking for just that information. A credit application should not be framed as a trap for the unwary. In order to ascertain the true facts, and show by the written statement what are alleged claims against an applicant for credit as distinguished from debts admittedly due, he can be asked: 'Are there any claims against you which you dispute? If so, state them.'"

In the case of In re Payne, D.C., 48 F. Supp. 360, 361, a creditor bank objected to the bankrupt's discharge on the ground that the financial statement which he furnished the bank was false in that, among other things, he had failed to list a liability for three months' rent upon his place of business. In dismissing the objections and confirming the bankrupt's discharge the court said:

"Nor did the bankrupt's failure to list as a separate liability three months' rent upon his place of business require a finding of fraudulent intent. The bankrupt testified that at the date of the statement he did not consider this item as a liability. To be sure, this claim for rent was eventually reduced to judgment but the judgment was not obtained until some time after the date of the statement."

As hereinbefore stated, the question as to whether the bankrupt's written application to the Union bank for a loan on May 10, 1954, was "materially false" within the meaning of section 14 of the Bankruptcy Act, must be determined in accordance with the established law as applied to the particular facts and circumstances in this case. The bankrupt was legally entitled to a discharge unless it was established that his application to the bank was "materially false" respecting his financial condition. The court has considered the testimony and the exhibits presented and concludes that there is no evidence showing, or from which it could be inferred, that the bankrupt's written application to the Union bank was made with an intention to defraud and deceive and was knowingly and intentionally untrue. Therefore, his application was not "materially false" within the meaning of section 14 of the Bankruptcy Act.

The court has studied the many authorities cited by counsel for the objecting creditors in support of their contention that the bankrupt's application to the bank was materially false and justified denying him a discharge. However, it is unnecessary to discuss each of these cited decisions, as the particular factual situation presented in each case distinguishes it from the present case.

For the reasons stated herein the court concludes: (1) That under the facts and circumstances in the present case, the bankrupt's written application to the Union bank on May 10, 1954, was not a "materially false statement", within the meaning of section 14, sub. c(3) of

the Bankruptcy Act, respecting his financial condition; (2) that the referee was in error in holding that the bankrupt's application to the bank was materially false; (3) that the referee erred in denying the bankrupt a discharge; and (4) that the bankrupt is legally entitled to a discharge.

Therefore, the creditors' objections to the bankrupt's discharge are overruled and dismissed; the order of the referee entered April 8, 1955, denying discharge is reversed and set aside; and this matter is remanded to the referee in bankruptcy for further proceedings in accordance with this opinion.