MORIMURA, ARAI & COMPANY *v.* TABACK ET AL.

No. 18. Argued October 9, 1928.—Decided February 18, 1929.

*Mr. James D. Carpenter, Jr.,* with whom *Mr. Edmonds Putney* was on the brief, for petitioners.

*Mr. Frederic M. P. Pearse,* with whom *Messrs. David H. Bilder* and *Nathan Bilder* were on the brief, for respondents.

Mr. JUSTICE SANFORD delivered the opinion of the Court.

In September, 1920, Nathan Taback and Louis Taback were adjudged bankrupts, both individually and as part-

ners trading as Taback Brothers, under an involuntary petition in bankruptcy filed against them in the District Court for New Jersey. They seasonably applied for discharge. The firm of Morimura, Arai & Co., an objecting creditor, filed specifications of opposition on the two grounds, among others: That the bankrupts had obtained property on credit on a materially false statement in writing made by them to the objecting creditor for the purpose of obtaining credit; and that with intent to conceal their financial condition they had destroyed, concealed or failed to keep books of account or records from which such condition might be ascertained. Bankruptcy Act, § 14b, as amended by § 6 of the Act of June 25, 1910, 36 Stat. 838, c. 412.[1] The issues so raised were referred to the referee, as special master, to take proof and report it to the court, with his findings thereon.[2] He took the proof in 1921 and 1922, and in 1926 reported that in his opinion the bankrupts were entitled to discharge. The District Judge sustained exceptions to this report and ordered that the application for discharge be denied. The Circuit Court of Appeals reversed this order, with directions to dismiss the exceptions and discharge the bankrupts, 21 F. (2d) 161.

The Morimura Company relies here on both of the grounds of opposition mentioned above.

The first of these grounds is predicated on a written statement made to the Morimura Company in January 1920. This, under § 14b(3) of the Bankruptcy Act, as amended in 1910, required a denial of the discharge, if (a) the bankrupts obtained property on credit from the

---

[1] Sec. 14b was later amended in material respects by § 6 of the Act of May 27, 1926, 44 Stat. 662, c. 406.

[2] As to such references see generally §§ 14(b) and 38(4) of the Bankruptcy Act; General Order in Bankruptcy No. 12, § 3; *International Harvester Co.* v. *Carlson* (C. C. A.), 217 Fed. 736; and *In re Hughes* (C. C. A.), 262 Fed. 500.

Morimura Company upon this statement, and (b) the statement was materially false and (c) was made to the Morimura Company for the purpose of obtaining such property on credit. See *Gerdes v. Lustgarten*, 266 U. S. 321, 323, 326.

In the master's report—which is set forth in the margin [3]—he made no specific findings of fact in reference to the precise issues, but without citing any testimony or giving his reason, stated generally that he believed the statement " was substantially correct." The District Judge—after referring to the vagueness and generality of this report—stated that obviously the statement was false and was made for the purpose of obtaining credit. The Circuit Court of Appeals—after referring to the fact that

---

[3] In this report the master stated: " I beg leave to report that the objections to the discharge of the bankrupts in this case are predicated largely upon a statement issued by the bankrupts as of December 31st, 1919. The adjudication in this matter was September 29th, 1920, and during the time between the giving of the statement . . . and the adjudication, . . . the silk business passed through one of the worst periods in its existence, raw silk declining from around $15.00 to $4.50 per pound, and I believe the statement issued by the bankrupts in 1919 was substantially correct. The old books of the bankrupts were apparently destroyed, but the new books, for considerable time prior to the bankruptcy, had been so far as the records show, correctly kept. The bankrupts did obtain property on credit, but not to the extent of the credit that had been extended to them; they bought a large quantity of raw silk on contract, running into the several hundred thousand dollars, which was apparently a gamble between the bankrupts and the creditors as to which one was going to win, and with the exception of a few discrepancies in the books which were afterwards explained, it is my opinion that the said bankrupts have in all things conformed to the requirements of (the Bankruptcy Act of 1898); and that the testimony herein and returned herewith shows that the said bankrupts have committed none of the offenses and done none of the acts prohibited by said Act, and that, in my opinion, the said bankrupts, Nathan Taback and Louis Taback, ind. and as prts. trdg. as Taback Brothers, are entitled to their discharge."

the master saw and heard all the witnesses—without determining whether or not the statement was correct, stated that they were not satisfied that "a consciously false financial statement was made for the purpose of obtaining credit."

As there is no concurrent finding on any of the material issues relating to the written statement, we have examined the evidence at length for the purpose of determining the essential facts.

Shortly stated, it appears that in 1917 the two Tabacks entered into the business of buying and selling silk as partners under the firm name of Taback Brothers. The capital consisted of borrowed money. The firm carried on business in New York until May 1920, when it moved to New Jersey. The business gradually enlarged, and the firm established a good credit, paying its bills promptly and frequently taking the cash discounts. It began to purchase silk from the Morimura Company in 1919. On a financial statement showing that on July 1 the firm had a net worth of $140,000, the Morimura Company in September extended it a line of credit of $20,000, on terms of sixty days. From that time until January 1, 1920, the firm bought about $150,000 worth of silk from the Morimura Company, and paid all of its bills before maturity. However, during that time Nathan Taback, who had charge of this branch of the firm's business, on different occasions, applied, both in person and through the salesman from whom he purchased the silk, to the credit manager of the Morimura Company for an enlargement of the line of credit. This the manager refused until he had a new financial statement on which to base an increase.

On January 1, 1920, the firm opened a new set of books. An accountant carried forward to the new books the entries from the previous books which showed the status of affairs of the firm on December 31, 1919. The correct-

ness of the old books and of the transfer to the new books is not questioned. In the opening entries of the new books the capital of one of the partners was shown as $4,385.93, and that of the other as $7,285.50, making a total capital of $11,671.43.

From that time until the bankruptcy the new books were used by the firm; and they were introduced in evidence. The old books, which were stored in the office until the firm moved to New Jersey in the following May, were then cast aside and could not be produced in evidence.

There was introduced in evidence a tabulated statement compiled from the opening entries in the new books, which is set forth in the margin.[4] This tabulated statement—the accuracy of which was not questioned—shows that on January 1, 1920, the total assets of the firm, as shown by the new books, were $277,846.48, and the total liabilities $266,175.05, leaving a net worth of $11,671.43— the exact amount of the aggregate capital of the two partners as shown on the books.

---

[4] This reads as follows:

Taback Bros.

Assets and Liabilities as per Books January 1st, 1920

*Assets.*

| | |
|---|---:|
| Cash in Banks, Paterson, N. J. | $25,318.95 |
| Accts. Receivable (Good) | 19,887.98 |
| Notes Receivable (Good) | 43,352.89 |
| Inventory of Mdse. on hand at Cost, Raw Silk | 43,500.00 |
| Liberty Bonds | 12,170.79 |
| First Mortgage held on Real Estate Property acquired at 80 George St., Paterson, N. J. | 126,225.00 |
| Loans Receivable | 3,215.99 |
| Furniture & Fixtures | 288.45 |
| Delivery Equipment | 3,886.43 |
| Total Assets | $277,846.48 |

On January 7, 1920, six days after the new books were opened, Nathan Taback furnished the credit manager of the Morimura Company a written statement which he had prepared and signed, purporting to show the assets and liabilities of the firm on December 31, 1919. The manager testified that at that time Nathan Taback requested an enlargement of the firm's credit, and that, after questioning Taback as to various items in the statement, he agreed to extend the firm a line of credit of $40,000 on four months' time. This was denied by Nathan Taback; and both the bankrupts testified that this statement was made merely to show how they stood, and that they did not then need any credit from the Morimura Company.

This statement, which is set forth in the margin,[5] is utterly irreconcilable with the financial condition of the

---

### Liabilities.

| | | |
|---|---|---|
| Mortgage Payable | $42,500.00 | |
| Notes " | 109,246.18 | |
| Accts. " | 28,876.09 | |
| Loans " | 9,926.63 | |
| Exchanges | 36,840.30 | |
| H. F. Taback—Loan | 38,785.85 | |
| Total Liabilities | | $266,175.05 |
| Net Worth | | 11,671.43 |

| | |
|---|---|
| N. Taback—Capital | $4,385.93 |
| L. Taback— " | 7,285.50 |
| | $11,671.43 |

[5] This reads as follows:

Phone Farragut 9986.

Taback Bros., Broad Silks, 1133 Broadway, New York.

Financial Statement of Taback Brothers, Dec. 31st, 1919.

### Assets.

| | |
|---|---|
| Cash in Banks, Paterson, N. J. | $28,089.79 |
| A/c Receivable, Good | 13,830.54 |
| Notes Receivable, Good | 78,355.70 |

30

firm as disclosed by the new books opened on January 1. This appears by a comparison with the tabulated statement compiled from these books.[6] The statement of January 7 shows on its face total assets of $372,066.03 as against only $277,846.48 shown by the books; a liability, of only $96,395.20, by open account, as against total liabilities of $266,175.05 shown by the books; and a net worth of $275,670.83 as against only $11,671.43 shown by the books; that is, the statement of January 7 shows $94,219.55 more of assets and $169,779.85 less of liabilities than those shown by the books; and a net worth of $263,999.40 more than the net worth shown by the books. And, as appears by a detailed comparison between the statement of January 7 and the tabulated statement, every item in the statement of January 7 is materially different from the corresponding item appearing on the books.

No evidence whatever was offered by the bankrupts to account for the discrepancies between the statement of January 7 and the tabulated statement drawn from the books. There was no effort to show that the firm had on December 31, 1919, any assets that were not shown on the books, or did not owe any of the liabilities shown on

Inventory of Mdse. on hand at cost, Raw
Silk.................................... $67,500.00
Liberty Bonds......................... 16,200.00
First Mortgage held on Real Estate....... 8,000.00
Property acquired at 80 George St., Paterson, N. J........................... 160,000.00

Total Assets................................. $372,066.03

*Liabilities.*

A/c Payable not due............................... 96,395.20

Net worth................................ $275,670.83

Taback Bros. (Sign-by) Nathan Taback.

[6] Note 4, *supra.*

the books. While Nathan Taback stated generally that the statement of January 7 was correct to the best of his knowledge, he testified that the accountants who opened the new books had not then reported to him the financial condition appearing on the books; and, being asked where he got his statement, said: "I sat down in the office on a certain day and I looked up the balance sheets in the bank, both banks, . . . and I looked up my stock, and I looked up what we had on contract, and what we have sold to be delivered, January, February and March—we had at that time $100,000 profits to be made which was sold to good concerns, and I figured my building so much worth, and so I wrote out my profit what it was worth on January 1st, so much for building, and I made up my statement with my own soul. Q. You didn't compare your assets and liabilities with the books? A. I followed my own information of what we had, and my brother came up from New York and I told him what we took up as profits, which was not cashed in yet, but I figured I am worth the money. Q. Where did you get the liabilities from? A. I looked up the unpaid items and I checked up and found out what was paid and unpaid, and that is what I put down, my own figures to my best knowledge. Q. Did you compare them with the items of liabilities as appeared on the books? A. Mr. Putney, as far as I had knowledge of, I tried my best to not give a false statement. Q. Did you look at your books to see? A. I looked at the books to see what was owing to us and to see what we owed, and I took it down to my own best knowledge. . . . . Q. Did you, when you were making this statement for (the credit manager) look at (the purchase ledger) book in order to get the amount of the debts which you owed? A. No." And when asked in reference to the fact that the statement of January 7 showed that the liabilities were only $96,395.20 (by accounts payable), while the general ledger showed "notes payable" alone

of $109,246.18 on January 1, he said: "I took it the way I explained before, but I didn't touch the books."

Louis Taback, who had charge of the firm's sales and could not read or write, testified that he did not find out that a statement had been given to the Morimura Company until about a day or two afterward when his brother told him he had been up to the Morimura Company and given a statement of how they stood, and that, as he understood, "my brother looked up the stock and said it was worth between $275,000 and $300,000. . . . He figured up what we took in and what we sold and the mill, and he showed me how much we are worth."

On January 10 the firm contracted with the Morimura Company for the purchase of twenty bales of silk at a stipulated price on terms of four months after delivery in February.[7] In April the Morimura Company delivered to the firm the twenty bales called for by the contract, taking in payment two trade acceptances, aggregating $39,536.19, at four months each. The credit manager of the Morimura Company testified that the contract and deliveries were made in reliance upon the statement of January 7.

In the latter part of January the price of silk began to fall. This finally resulted in a panic in the silk market, and the firm became bankrupt in September. Between January 1 and the bankruptcy it had bought more than $100,000 worth of silk from the Morimura Company in addition to the twenty bales of silk mentioned above, and had also bought a large amount of silk on credit from other dealers. For some time it paid its bills to the Morimura Company before maturity, and at the time of the bankruptcy had paid everything due the Morimura Com-

---

[7] The memorandum of purchase which was introduced in evidence is not copied in the transcript, but is set out in the brief for the Morimura Company, and is not questioned in the brief for the bankrupts.

pany except the trade acceptances for $39,536.19 given in April, which were still unpaid.

Upon the entire evidence we reach the following conclusions:

1. The undisputed evidence shows that the written statement of January 7 was materially and grossly incorrect, purporting as it did to show that the firm had a net worth of approximately $264,000 more than the actual net worth shown by its books. The opinion of the master that this statement was " substantially correct "—the only specific finding made in his report—manifestly did not depend upon the weighing of conflicting testimony or the credibility of witnesses. For this reason, if for no other, it does not have the weight ordinarily attaching to the conclusions of a master upon conflicting evidence, as stated in *Tilghman* v. *Proctor,* 125 U. S. 136, 149; and it was clearly due to error or mistake.

2. It is established by the clear weight of the evidence that the written statement—which was made to the Morimura Company by Nathan Taback in behalf of the firm and was acquiesced in by Louis Taback—was not only incorrect but materially false within the meaning of § 14b (3) of the Bankruptcy Act; that is, that it was made and acquiesced in either with actual knowledge that it was incorrect, or with reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct.

3. It is established by the clear weight of the evidence that this false statement was made to the Morimura Company for the express purpose of obtaining silk on credit, and that upon it silk was in fact obtained from the Morimura Company on credit. Compare *Gerdes* v. *Lustgarten, supra.*

It follows that the specification of opposition based on this written statement should have been sustained, and

the bankrupts' application for discharge should have been denied.

It is not necessary to determine whether the other specification of opposition to the application for discharge, which was predicated upon the books of account or records kept by the firm after January 1, 1920, should also have been sustained, since even if this were the case the result would not be changed.

The decree will be reversed and the cause remanded to the District Court, with instructions to enter a decree sustaining the specification of opposition relating to the written statement and denying the bankrupts' application for discharge.

*Reversed and remanded.*