## In re BROWNSTONE.

District Court, S. D. New York.

Dec. 2, 1936.

Robert P. Levis, of New York City, for bankrupt.

Saul S. Myers and Joseph K. Guerin, both of New York City, for specification creditors.

COXE, District Judge.

These are specifications of objection to a bankrupt's discharge which were filed by three creditors; they were referred to a referee for hearing and report; and the referee has reported that none of the specifications has been sustained, and has recommended that a discharge be granted. The bankrupt asks for the confirmation of the report; the objecting creditors challenge its correctness and oppose confirmation.

The specifications as originally filed were extremely voluminous; a considerable number were either withdrawn or dismissed by the referee; and the remainder charge that the bankrupt (1) obtained credit from County Trust Company, a New York banking institution, on a false personal financial statement (specifications 1 and 2); (2) gave to four other New York banks false financial statements of J. C. Brownstone Company, the stock of which was wholly owned by the bankrupt (specifications 3, 4, 5, and 6); (3) transferred various assets with intent to prefer and to hinder, delay, and defraud (specification 7); (4) failed to keep proper books of account or records (specifications 8

and 11); (5) failed to explain satisfactorily losses or deficiency of assets (specification 9); (6) concealed various assets from the trustee (specification 10); and (7) swore falsely at different times during the bankruptcy proceedings (specifications 12 and 13).

The bankrupt was president, treasurer, and owner of the entire capital stock of J. C. Brownstone Company, a New York corporation, which owned and operated, through a number of subsidiaries, a chain of 47 or 48 retail clothing stores in different parts of the country; he was the dominating spirit in all of the company's activities, determined its general policies, arranged for loans and bank credits, dictated its investments, and treated the business largely as his own. He was also active in a number of outside ventures, was a director and a large stockholder in the Bank of United States; an officer, director, and heavily interested in Court Square Building, Inc., which owned a large office building at 2 Lafayette street, New York City; had extensive dealings with New York financial institutions, and maintained substantial margin accounts with New York brokerage houses.

On December 12, 1930, J. C. Brownstone & Company went into receivership in equity proceedings in this district, and, in a comprehensive report made by the accountants for the receiver, as of December 12, 1930 (filed in this court) the realizable assets were stated to be $300,007.20 as against total liabilities to creditors of $1,183,975. The entire assets of the company were sold by the receiver on March 2, 1931, to a newly organized purchasing corporation for a cash payment of 10 per cent. on creditors' claims, and an agreement to pay a further 20 per cent. in installments over an extended period of time.

On April 11, 1931, an involuntary bankruptcy petition was filed against the bankrupt, to which the bankrupt answered denying insolvency, and demanding a jury trial. The bankrupt was then examined in 21-a proceedings, and testified that he had no free assets aside from his personal effects. Finally, on February 10, 1933, an order of adjudication was entered on consent. The schedules show liabilities of $1,698,976.76, and no visible assets.

The financial statement which forms the basis of specifications 1 and 2, reads as follows:

"J. C. Brownstone & Company,
"84–90 Fifth Avenue
"New York.
"J. C. Brownstone      September 9, 1930
"President

### Assets

| | |
|---|---|
| Cash | $ 2,941.82 |
| 100% capital stock J. C. B. & Co. and subsidiary companies valued at | 1,424,518.00 |
| Other investments | 275,000.00 |
| | $1,702,459.82 |

### Liabilities

| | |
|---|---|
| Loans payable | $ 175,000.00 |
| Net worth | $1,527,459.82 |

"The above is my personal statement as of today.
"J. C. Brownstone."

This personal statement was accompanied by a supporting statement of "J. C. Brownstone & Company and subsidiary companies," as of August 25, 1930, which showed assets of $2,120,173.40 and "capital stock and surplus" of $1,424,518.

On January 1, 1930, the County Trust Company held the bankrupt's demand note for $75,000 secured by 1,205 units of the Bank of United States. This stock had declined considerably in value in 1930, and on August 13, and 19, 1930, Kelly, the president of the Trust Company, wrote the bankrupt, asking him to call regarding "the condition of your loan." The bankrupt came in to see Kelly on September 9, 1930, and was told that the loan was not adequately secured, that the stock "had gone down," and that the Trust Company would have to have a substantial payment or additional collateral. Kelly had only become president of the Trust Company a short time before, and this was the first time he had ever met the bankrupt.

What transpired during the balance of the interview was the subject of a conflict in the testimony. Kelly testified: "We discussed the loan, and I told Mr. Brownstone that it would have to be put in shape; it wasn't properly secured; I told him about the money necessary to do that, and he said that he would arrange to make a substantial payment, and spoke to me about lending him some money to do this with, as he did not have any more available collateral; I told Mr. Brownstone that the granting of a loan would depend upon

his financial condition, and that before I would do it I would like to have a financial statement, a recent financial statement."

The bankrupt denied that Kelly either mentioned or asked for a personal financial statement during this first interview; he said that an agreement was reached "that I give him $10,000 then, and $5,000 every ninety days until the note was put in proper shape." Later in his testimony, he qualified this statement by saying that he "thought it would be settled that way." Following the interview, the bankrupt made a payment of $10,000 on the note, thereby reducing his indebtedness to the Trust Company to $65,000.

The bankrupt further testified that Kelly sent for him again on September 11, 1930; that in response to this summons he went to the Trust Company and was asked to sign two notes, one a demand note for $35,000, secured by the 1,205 Bank of United States units, and the other an unsecured note for $30,000, due in ninety days; and that he then and there signed both notes, and also a check for $30,000, all of which he left with the Trust Company. He said that just as he was about to leave, Kelly, for the first time, asked him for a financial statement. His testimony on this subject is as follows:

"Q. And what happened when you were just about to leave on September 11th? A. Just when I was about to leave he said he would like to have a personal statement. I said, 'What do you need a personal statement for? I never had a personal statement in my life. This is all my assets—that is J. C. Brownstone & Company.' He said, 'You say you have a lot of stock as collateral.' I said, 'Yes, it is probably worth $100,000.' So he said, 'What are the liabilities?' And I told him I had $100,000 in personal notes at the Bank of United States, and probably $40,-000 or $50,000 outside of that. Then he said 'Your collateral on margin requirements is worth $200,000 to $250,000.' I said, 'Probably, and I may owe $175,000; I am not sure.' So he said 'Then your collateral will be about $275,000.' I said, 'About that.' I said, 'Of course, all the bills receivable of J. C. Brownstone & Company and subsidiaries I am also liable for on account of my endorsements.' 'Well,' he said, 'that does not matter. The company is responsible for that.'

"Q. And what did he do then? What did Mr. Kelly do then? A. Mr. Kelly marked these items down on his own sheet of paper. He asked me how much cash I had and I said I don't know, I had probably a couple of thousand dollars in the bank. Then he said, 'What is the stock of J. C. Brownstone & Company,' and I said, 'About $1,500,000 odd—I don't know the exact amount.' Then he said, 'Have you got any other assets?' I said, 'All the other assets are up as collateral.' He said, 'You owe about $175,000 and your margin above the collateral, which is about $275,000, is $100,000,' and he added it on, and gave it back to me and said 'Take this back to your own office and put it on your own stationery and send it over to me.'

"Q. Did he tell you that he wanted those notes on account of the Banking Superintendent? A. He told me at that time, —he said, in case of an examination they should have a statement in their file."

The bankrupt said that he took the memorandum which Kelly gave him back to his office and handed it to Lomberg, the accountant, "to put on the exact amount of cash on hand and the exact figures," and that when this was done he signed the statement, and gave it to Lomberg to take to the Trust Company. He sought to explain the date of September 9, 1930, appearing on the statement by saying that "it was marked September 9 on the sheet of paper that Kelly gave." Lomberg testified that the bankrupt, on his return from the Trust Company, gave him a "pad" with figures on it in an unfamiliar handwriting, and that he expressed surprise, and asked the bankrupt where it came from; he also said that he took the completed statement back to the Trust Company and delivered it after banking hours to Fowler, one of the vice presidents, and not to Kelly.

Kelly insisted throughout that he made no agreement for an extension at the September 9 interview, but merely said that the granting of a loan would depend on the bankrupt's condition as shown by a recent financial statement. He denied that there was any detailed discussion at any time of the bankrupt's assets and liabilities such as testified to by the bankrupt, or that the bankrupt told him he was liable on indorsements. He said that when the statement came in "and on the basis of the statement, and a supporting statement of the Brownstone Company" he made the loan of $30,000.

The statement of September 9, 1930, standing alone, and regardless of the bankrupt's testimony with respect to his interviews with Kelly, was clearly false; it not only grossly understated the liabilities, but it also very much overvalued the assets. Indeed, there was no serious attempt by the bankrupt to justify the figures before the referee. Moreover, the statement was highly deceptive in failing to show in what way the liabilities were matched by corresponding assets. In re Maaget (D.C.) 245 F. 804.

The liabilities shown on the statement are $175,000. Yet the uncontradicted proof is that on September 9, 1930, the bankrupt was indebted on purely personal obligations to the extent of $823,257.28, and was further liable as indorser or guarantor for an additional $719,973.19.

In the statement, also, the bankrupt's ownership of the entire capital stock of J. C. Brownstone & Company was "valued at" $1,424,518, and the supporting statement of the Brownstone Company lists as an asset "Stock Court Square Bldg., Inc. (Marketable) $150,000." This same stock was at the time pledged with the Bank of United States to secure the bankrupt's personal loans amounting to $273,661.37, and was also held as security for the bankrupt's entire indebtedness to that bank of $756,116.46. In the face of this showing, it is difficult to see by what method of juggling the Court Square stock can be counted as an asset of the Brownstone Company.

■ But, even with the Court Square stock, the net worth of the Brownstone Company was greatly overvalued. The accountants for the receiver found that on December 12, 1930, or barely three months after September 9, 1930, the company was insolvent by over $800,000; and, when the assets were sold on March 2, 1931, the creditors realized only 10 per cent. in cash on their claims, and 20 per cent. additional in a deferred obligation. Surely, such a large shrinkage as this in so short a period of time can hardly be accounted for by the ravages of a depression which had then been in operation for nearly a year; it certainly called for explanation. Brenner v. Gaunce (C.C.A.) 28 F.(2d) 606; Mullen v. First National Bank (C.C.A.) 57 F.(2d) 711. And this explanation the bankrupt was unable or unwilling to give.

The statement also placed the value of "other investments" at $275,000. It was shown, however, that the market value of all of the bankrupt's securities exclusive of the Court Square stock, did not exceed $133,490; and these securities were all pledged at the time to secure the bankrupt's personal loans. What the Court Square stock was worth was entirely problematical; it represented a one-fourth interest in the equity of an office building which was assessed for only $3,100,000, and had mortgages of $3,777,500 outstanding; it was at best an asset of extremely doubtful value; and when the stock was sold in December, 1933, by the liquidator of the Bank of United States it only realized $25,517.80. The "expert" testimony before the referee regarding the value of the building was far from persuasive; and the attempt of the bankrupt himself to establish a value of $450,000 for his stock interest, based on an informal discussion with another stockholder a number of years before, was unsuccessful.

■ Was the statement relied on by the Trust Company? The referee inferentially holds that it was not, but there is no express finding on the subject, nor is there any unequivocal rejection of Kelly's testimony, or any clear acceptance of the testimony of the bankrupt. The two stories are, of course, conflicting, and, although I realize fully that the referee, who has seen and heard the witnesses, is in a better position than I am to determine questions of credibility, I still think that on the record as it stands, the conclusion reached by the referee is untenable. It is to be remembered, also, in this connection that the referee acts in matters of this kind "merely as advisory master to investigate and report, the court being in no wise bound by his findings." In re Schlesinger (D.C.) 31 F.(2d) 789, 790; International Harvester Co. v. Carlson (C.C.A.) 217 F. 736; In re Hughes (C.C.A.) 262 F. 500.

■ Section 14b, subdivision (3) of the Bankruptcy Act, as amended (11 U.S.C.A. § 32(b)(3) specifies as one of the grounds for refusing a discharge that the bankrupt has "obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing, or causing to be made or published, in any manner whatsoever, a materially false statement in writing respecting his financial condition."

Under this subdivision the essentials to the statutory bar are: (1) That the

406

written statement was made for the purpose of obtaining credit; (2) that it was materially false; and (3) that the credit was obtained upon it. Gerdes v. Lustgarten, 266 U.S. 321, 45 S.Ct. 107, 69 L.Ed. 309; Morimura, Arai & Co. v. Taback, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586.

■ Clearly the loan of $30,000 made to the bankrupt was "an extension or renewal of credit" within the language of the statute. I do not doubt, either, that the statement was materially false, and made knowingly "or with reckless indifference to the actual facts." Morimura, Arai & Co. v. Taback, supra, 279 U.S. 24, at page 33, 49 S.Ct. 212, 215, 73 L.Ed. 586; In re Kellerman (D.C.) 2 F.Supp. 520.

I think, also, that the Trust Company relied on the statement. The loan was not adequately secured when Kelly wrote the bankrupt on August 13, and 19, 1930, asking him to call regarding the condition of his loan. The bankrupt did call on September 9, 1930, and it is not denied that Kelly then asked him for a substantial payment or additional collateral. Even the bankrupt does not contend that there was any agreement for an extension on that day, but merely that he "thought it would be settled that way." And the payment of $10,000, which the bankrupt made immediately after the interview, was nothing more than a payment on account.

The statement was delivered to the Trust Company on September 11, 1930, and the date which it bears of September 9, 1930, strongly supports Kelly's testimony that at the first interview he insisted on having a "recent financial statement" before determining whether to grant any further extension of credit. It was entirely natural that Kelly should have wanted a financial statement from the bankrupt, for the loan, even with the $10,000 payment, was still inadequately secured, and Kelly himself had little personal knowledge of the bankrupt or his business affairs. Moreover, Kelly was being asked to make a substantial loan to the bankrupt without any security whatever. It seems highly incredible, also, that there should have been insistence on a financial statement if the only purpose was to satisfy the bank examiners. This same contention has been made before and rejected [In re Trimble (C.C.A) 55 F.(2d) 165], and there is nothing here to indicate that it should receive different treatment now. The statement was given by the bankrupt for credit purposes, the records of the Trust Company show that the new loan of $30,000 was put through on the very day the statement was received, and every reasonable inference supports Kelly's testimony that "on the basis of the statement, and a supporting statement of the Brownstone Company," the loan was made.

The bankrupt says that he gave Kelly during the two interviews he had with him, full and complete information regarding his financial condition, and that the principal figures appearing on the statement were taken from a memorandum handed to him by Kelly when he was at the Trust Company. But, even on the basis of what the bankrupt says he told Kelly, the statement was still hopelessly false. The bankrupt did not have any equity in pledged securities over margin requirements of $275,000; his personal loans by no possible method of calculation were as low as $175,000, and his ownership of the entire capital stock of J. C. Brownstone & Company was not fairly worth any such amount as $1,424,518. The case for the bankrupt is not, therefore, materially affected by his testimony regarding the Kelly interviews.

I think that specifications 1 and 2 have been sustained, and, in view of this disposition, I do not deem it necessary to pass on the other specifications.

The discharge of the bankrupt is refused.