**In re DAVID.**

**No. 10137.**

United States District Court
D. Maryland.

March 31, 1953.

Samuel J. Fisher and Allan H. Fisher, Jr., of Baltimore, Mr., for bankrupt.

William L. Marbury and Frank T. Gray, of Baltimore, Md., for Annapolis Banking & Trust Co.

WILLIAM C. COLEMAN, Chief Judge.

This matter is before the Court on a petition for review of the Referee's order denying the bankrupt her discharge on the ground that she obtained loans from a bank as a result of making to the bank materially false statements in writing respecting her financial condition, the doing of which being one of the grounds enumerated in the Bankruptcy Act for denying a discharge to a bankrupt. Section 14, sub. c(3), 11 U.S. C.A. § 32, sub. c(3). The trustee in bankruptcy objected to the discharge on this ground and the Referee sustained the objection.

Section 14, sub. c, of the Bankrupty Act enumerates seven acts, the commission of any one of which by a bankrupt is made ground for denial of a discharge. With respect to false statements made by a bankrupt as to his financial condition, this section of the Act provides as follows: "The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition; * * *; * * * *Provided*, That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this subdivision, would prevent his discharge in

bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt."

We find the material facts to be as follows and that the Referee made these same findings upon which he based his conclusion in denying the discharge, except in certain particulars to which we will hereinafter refer: On August 18, 1949, that is about a year prior to the bankrupt's adjudication, the Annapolis Banking & Trust Company, Annapolis, Maryland, loaned to the bankrupt $50,000 on the strength of a written financial statement of the same date, which she supplied the bank. This statement showed that the bankrupt owned stocks and bonds of the then market value of $25,000 although actually she owned no stocks and bonds. The statement also listed among her assets "cows, steers and turkeys, of a value of $60,000.00." It was stipulated before the Referee that to the extent that there were any cows, steers and turkeys, these were either owned individually by the bankrupt's husband, Leon David, or by him and the bankrupt jointly. The statement further listed real estate of a value of $115,000, although in fact, the bankrupt owned no real estate except as tenant by the entireties with her husband. It further stated that her current liabilities were notes of which she was maker, payable in the amount of $14,583.39, although she had outstanding notes, the amount of which aggregated more than $273,000, of which she was maker and also was contingently liable as indorser on other notes aggregating more than $400,000. Mrs. David, the bankrupt, admitted these inaccuracies and also admitted that she personally inserted the aforegoing items in the statement upon her husband's advice, and then signed it. Her only explanation given with respect to these inaccuracies is that they were honest mistakes on her part resulting from unquestioned reliance upon the figures given her by her husband, with respect to which she had no individual knowledge, because she was accustomed to rely implicitly upon him in all of her financial affairs and dealings. The bankrupt testified before the Referee that the form on which she made this financial statement was presented to her in their home, together with the figures which she said she inserted therein, without questioning any of them. She denied that she knew or made any inquiry of the intended use to be made of the statement by her husband, who presented the statement to the bank without her being present and negotiated a loan of $50,000. However, the statement contains a printed certification addressed to this particular Bank, above the bankrupt's signature, that "The foregoing financial statement and all details pertaining thereto have been carefully gone over by the undersigned, and I hereby certify that they set forth a true and accurate statement of our (my) financial condition."

The bankrupt further testified that for a number of years she had been accustomed to sign all papers that her husband asked her to sign; that originally she sought explanation from him before signing but that her husband's consistent refusal to give any explanation caused her to acquiesce in his request, without more; and that in August, 1949, she had no knowledge that her husband was in financial difficulties, her understanding being to the contrary. In short, her testimony was to the effect that the preparation and signing of the financial statement here in issue was merely one of a long chain of similar acts which she had performed in blind reliance upon her husband, and was not done with any intentional misrepresentation for the purpose of obtaining money or credit from the bank.

The Referee's findings of fact differ from the aforegoing in this material respect, namely, that in his findings as embodied in his opinion, he stated that the bankrupt "owed some $72,000.00 and contingently more than $200,000," whereas, as above set forth, we find from the agreed stipulation made in the course of the proceeding before the Referee, her obligations, both direct and contingent on notes, was very much in excess of these latter amounts, namely, more than $273,000 as maker of notes and in excess of $400,000 as indorser on other notes.

It is well settled that a bankrupt who obtains money or property on credit upon a written statement materially and grossly incorrect is not entitled to a discharge in bankruptcy if such statement is

made, or its making is acquiesced in by the bankrupt, to a seller or a financial institution for the purpose of obtaining money, goods or credit, with actual knowledge on the part of the bankrupt that such statement was incorrect, or with reckless indifference to the actual facts and no reasonable ground to believe that it was correct. See Morimura v. Toback, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586; Banks v. Siegel, 4 Cir.; 181 F.2d 309; Levy v. Industrial Finance Corp., 4 Cir., 16 F.2d 769.

In the Morimura case, supra, the Supreme Court said, 279 U.S. 24 at pages 33–34, 49 S.Ct. at pages 215, 73 L.Ed. 586:

"2. It is established by the clear weight of the evidence that the written statement—which was made to the Morimura Company by Nathan Taback in behalf of the firm and was acquiesced in by Louis Taback—was not only incorrect but materially false within the meaning of section 14b(3) of the Bankruptcy Act, 11 U.S.C.A. § 32b(3); that is, that it was made and acquiesced in either with actual knowledge that it was incorrect, or with reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct.

"3. It is established by the clear weight of the evidence that this false statement was made to the Morimura Company for the express purpose of obtaining silk on credit, and that upon it silk was in fact obtained from the Morimura Company on credit. Compare Gerdes v. Lustgarten [266 U.S. 321, 45 S.Ct. 107, 69 L.Ed. 309], supra.

"It follows that the specification of opposition based on this written statement should have been sustained, and the bankrupts' application for discharge should have been denied."

We concur in the statement of the Referee contained in his findings of fact that "The reliance of a wife upon representations of her husband is understandable, and an excuse for many mistakes of ignorance. It is obvious, however, that Mrs. David knew that the statement which she was completing was intended to provide the basis for obtaining credit for herself and that others would rely on it. This was self-evident from the statement to anyone of normal intelligence who scanned it even cursorily. Mrs. David is an intelligent woman, and she filled out the blanks in the statement herself."

Without giving her exact words, the following is a further summary of some of the material parts of Mrs. David's testimony: She stated that her husband presented to her a copy of the financial statement here in issue, and, without telling her what it was, asked her to rewrite it in her own hand. She said she asked him to explain it, but that he said she would not understand it and that he "laughed it off". She further said that she had "signed hundreds of papers" at his request and rarely asked him for any explanation; that at the time she signed the statement she did not know that her husband was financially involved, and that she did not read the statement when she signed it, nor did she know that the purpose of it was to obtain a loan or that, at the time she signed it, she had an outstanding loan with the Annapolis Banking & Trust Company. She also testified that while she did not personally deposit the proceeds of the loan obtained as a result of the statement she gave to the Bank, namely, $50,000, she did draw very shortly thereafter two checks against this account in the aggregate amount of $49,999.59, but did not know for what purpose the money was being withdrawn, and did not personally receive the proceeds.

The bankrupt's attitude may be summed up in the following statements: "I signed anything my husband brought home to me. * * * I never knew what I owned frankly." It is, however, undisputed, that when the Bank granted the loan, it was done in reliance upon the bankrupt's written financial statement here in issue, and that the Bank issued a check, payable to the bankrupt, for the full amount of the loan; that the indorsement on this check was not in the bankrupt's handwriting, but it indicated it was for deposit to her account in the Union Trust Company, Baltimore; and that one of the checks which the bankrupt drew

against this Union Trust Company deposit was for $35,400, payable to her husband's company, the Brookline Chemical Works, Inc., and that the other check which she likewise drew against this deposit was payable to the Brooklyn-Curtis Bay Bank, to liquidate the balance due on a loan by that bank to the bankrupt's account.

After analyzing the business methods of the bankrupt's husband in which he was accustomed to use his wife as a straw, many of his business assets being held in her name, and pointing out that therefore Mrs. David might not have known the amount of her obligations, the character or extent of securities that her husband might have put in her name, or the distinction between her sole property and that held with her husband as tenant by the entireties, the Referee makes the following statements in his opinion: "If this were all, Mrs. David might honestly have believed that the figures presented were true, although the whole proposition seems highly dubious. The fact which controls our decision is the admittedly false listing of cows, steers, and turkeys as one of her assets, valued at $60,-000. In the first place, this was not business property; it was an unusual asset for her family, and one of which she would have known if it existed. In the second place, even for a wealthy family, $60,000 is a considerable sum of money to be invested in such assets, and represents an enormous number of cows, steers and turkeys. In the third place, animals are the type of property in which a woman would be interested, and it seems probable that a woman of this type would have known if such animals had been in her name. It is therefore inconceivable that Mrs. David did not know the item 'cows, steers & turkeys—$60,000' was incorrect, regardless of the confidence which she had in her husband, and we so find."

 We cannot agree with the Referee's conclusion that the bankrupt must be denied a discharge primarily because of her "admittedly false listing of cows, steers, and turkeys as one of her assets, valued at $60,-000." Her conduct with respect to these items does not appear to us to have been as completely inexcusable as her false state-ments with respect to the outstanding notes, both those on which she was maker and those on which she was contingently liable as indorser, totaling over $600,000. In spite of these very large obligations, her statement to the Bank was to the effect that her current liabilities consisted of notes on which she was maker for less than $15,000. She has admitted this gross inaccuracy but the only excuse she has given is that she did what her husband told her to do. We believe that this is an insufficient excuse, because it indicates, within the language of the Supreme Court's opinion in the Morimura case, supra, "reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe" that the figures were correct.

There is no evidence of any threat, duress or compulsion by the bankrupt's husband in getting her to adopt the figures which he presented, but his conduct, of course, was utterly dishonest and reprehensible. The bankrupt simply admitted blandly that she was willing to sign *anything* that he asked her to sign. Although a wife may, quite naturally, and usually does delegate to her husband the handling of her financial affairs, nevertheless, when it comes to her obligations to her creditors, particularly when, as here, the wife is seeking to be forever discharged from these obligations which are extremely large, there is a point beyond which "blind" delegation and obedience to the husband is not justified. We are satisfied that under the undisputed facts in the present case, this point has been passed. Clearly this is not a case where "such duty as the subject owes the prince, even such, a woman oweth to her husband * * *." The bankrupt has not sustained the burden of proving justification for what she did; a burden which, under Section 14, sub. c, of the Bankruptcy Act, fell upon her, after the Trustee had made out a prima facie case, as he clearly did, that there were reasonable grounds to believe that the bankrupt was legally responsible for making, and obtaining money on, the false statement.

For the aforegoing reasons, the Referee's denial of discharge is affirmed.