**In re SANTOS.**

**SANTOS**

v.

**GENERAL FINANCE LOAN CO.**

**No. 11033.**

United States Court of Appeals
Seventh Circuit.

April 1, 1954.

Rehearing Denied April 28, 1954.

Landon L. Chapman, Arthur Chittick, Chicago, Ill., for appellant.

Carlyle J. Mills, Chicago, Ill., for appellee.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

The referee in bankruptcy entered an order denying a discharge to the bankrupt because of a false written statement respecting his financial condition submitted for the purpose of obtaining a loan. This order was approved and confirmed by an order of the District Court, and from this the bankrupt appeals. Section 14, sub. c. of the Bankruptcy Act, the relevant statutory provision, states, in part:

"(c) The court shall grant the discharge unless satisfied that the bankrupt has * * * (3) obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing or causing to be made or published in any manner whatsoever, a materially false statement in writing respecting his financial condition; * * *." 11 U.S.C.A. § 32, sub. c(3).

The record discloses that the bankrupt and his wife, Antonio and Mary Santos, had a obtained a loan from General Finance Loan Company, the creditor ob-

jecting to the discharge, in December of 1951. At this time an application form was filled in with the usual information pertinent to an application for credit, including a list of outstanding debts. This form became a part of the company's permanent records, and it contains a running account of the dealings between the bankrupt and the loan company.

On January 22, 1952, the bankrupt and his wife obtained a second loan from General Finance, and it was in loan that a false written statement was the course of the negotiations for this submitted. The next month Santos filed a voluntary petition in bankruptcy. The bankrupt is illiterate in that he cannot read anything other than individual letters in the alphabet nor write anything other than his name. However, his wife filled in a financial statement with his authority and in his presence, in which she listed the names of four creditors and the amount owed to each, and beneath this list of creditors she wrote the words, "We have no other debts." The financial statement was then signed by both the bankrupt and his wife. It is not disputed that at this time the bankrupt had a number of additional debts which were not listed and which amounted to a substantial sum.

The referee found, in part, that the bankrupt signed his name to the financial statement knowing it to be false or with reckless indifference as to whether or not it was true, and that the objecting creditor relied on the financial statement in making the loan. The bankrupt attacks the validity of these findings, without which the order denying the discharge cannot be sustained.

It is urged first that there was no reliance by General Finance on the financial statement because Swanson, the loan company manager, dictated to the bankrupt's wife the contents of the statement, telling her which obligations to list and instructing her to write the words, "We have no other debts." Swanson was not asked whether or not those words were in fact written at his direction, but in respect to the remainder of the statement the evidence is in direct conflict. Mrs. Santos testified that Swanson told her which creditors to list and the amounts which they owed to each. Swanson denied this, stating that he instructed her simply to list all their obligations, and that she wrote down the amounts from memory. It is argued that the testimony of Mrs. Santos was the more reliable because it is not likely that she could have remembered or computed the exact amounts of principal and interest due the creditors listed. We are reminded also that Swanson did not deny telling her to write, "We have no other debts," and it is contended that loan companies in Chicago have generally caused applicants to insert such a declaration in their financial statements in in order to protect the companies against debtors who, having failed to disclose all their debts, later attempt to avoid payment by resorting to bankruptcy.

It is next contended that there could have been no reliance on the financial statement because the loan company actually agreed to make the loan on January 21, the day before the statement was drawn up. Again, the evidence relating to this contention is conflicting. Swanson testified that since the previous December, he had had no further dealings with the bankrupt until January 22, when he and his wife came into the office to apply for the second loan. But the bankrupt testified that he called at the loan company office late in the afternoon of January 21; that at that time he applied for the loan; and that he was then told to come back the next day with his wife to sign the papers. We are told that Swanson's testimony is discredited, and that of the bankrupt supported, by the notation "1/21/52," in the chattel search section of the application form; that it should be inferred from this notation that a chattel mortgage search was ordered on the 21st, and that it must, therefore, be concluded that the company had decided to make the loan before the financial statement was executed on the 22nd.

Our attention is next directed to a supervisor's notation on the application form which indicates that six of the loan company's customers had been referred there by the bankrupt. The notation then states that the bankrupt is "a good booster for us—so take a chance." We are asked to infer from this that the loan was made, not in reliance on the financial statement, but rather because the bankrupt had sent some business to the company.

Finally, it is contended that the loan company could not have been deceived by the false financial statement because a debt owing to the South Works Employees Credit Union, the largest of the unlisted obligations, was noted on the bankrupt's application form in the company's files. Apparently this notation was made in connection with the December loan, but it is insisted that the loan company must have known that the bankrupt could not have discharged the debt in the short time intervening.

■ Without deciding whether these arguments might be meritorious if presented in the proper forum, we think it is obvious that they could be directed only to the referee. It is not our function to resolve controverted factual questions nor to draw inferences, contrary to those drawn by the referee, from evidence which is susceptible of various interpretations. Whether the financial statement was dictated by Swanson, whether it could be inferred that he agreed on the 21st to make the loan, and the significance of the various notations on the application form, when considered with the oral testimony, were matters within the province of the referee to determine. Of course, we have before us the documentary evidence, which seems to give plausibility to the arguments advanced. But that evidence was before the referee, and it is not necessarily inconsistent with the inferences which he drew. Of much greater importance than this was the determination of the credibility of the various witnesses, a matter which only the referee

was competent to judge. It is no doubt true that he could properly have resolved these factual issues favorably to the bankrupt. However, we cannot say from this record that the finding of detrimental reliance is clearly erroneous. The referee's finding was, therefore, properly accepted by the District Court. General Order in Bankruptcy 47, 11 U.S.C.A. following section 53; In re Berberich, 7 Cir., 190 F.2d 53.

The argument concerning the company's knowledge of the credit union debt might be so compelling as to require a different conclusion, if it were not for other circumstances in the case. But even if we were to assume that as a matter of law the loan company had notice of this outstanding obligation, the admitted existence of other unlisted debts would sustain the referee's finding.

■■ It is also contended that the bankrupt, being illiterate, did not sign the financial statement with knowledge of its falsity. However, the record indicates that he had had considerable experience in dealing with loan companies; that he was aware of the requirement that existing debts be fully disclosed; and that his wife thought he knew the statement was false. There is evidence that Swanson, the loan company manager, questioned the bankrupt about his outstanding obligations and reviewed with him and his wife the listings in the financial statement. The bankrupt admitted, moreover, that he made no attempt to ascertain whether or not his wife had listed all of their debts. Considering all the circumstances, we think the evidence at least justified the finding that he signed the financial statement with reckless indifference as to whether or not it was true. This was sufficient to prevent the discharge, even if he did not actually know that the statement was false, since the loan company is held to have relied on the statement. Morimura, Arai & Co. v. Taback, 279 U.S. 24, 33, 49 S.Ct. 212, 73 L.Ed. 586; In re Finn, 3 Cir., 119 F.2d 656,

658; In re Lessler, 2 Cir., 74 F.2d 249, 250.

The order of the District Court is Affirmed.