In re Bill J. STEWART, Debtor.

UNITED SECURITY BANK, Plaintiff,

v.

Bill J. STEWART, Defendant.

Bankruptcy No. 3–81–00094.
Adv. No. 3–81–0603.

United States Bankruptcy Court,
E. D. Tennessee.

Feb. 3, 1982.

Leonard & McRee, Thomas M. Johnson, Bristol, Tenn., for plaintiff.

Waddy, Blankenship & May, Michael May, Kingsport, Tenn., for defendant.

## MEMORANDUM OPINION

CLIVE W. BARE, Bankruptcy Judge.

This adversary proceeding involves the dischargeability of debts. 11 U.S.C. § 523(a)(2)(A), (B). Trial was held October 19, 1981.

### I

The debtor, Bill J. Stewart, from 1954 until December 1980, was at all times principally engaged in the insurance business. In 1966 he purchased a one-third interest in J. T. Parker Insurance Agency, Inc., with two other principals, Donald C. Wolford and George A. Jeter. Stewart served as president of the Agency until he sold his interest to the other principals in December 1980.

In 1972 Stewart entered into a partnership business with C. W. Hurst and sold recreational vehicles from his home. The business was part-time for both partners. In 1974 Stewart purchased Hurst's interest in the recreational vehicle business and the business was expanded and incorporated as Mall Auto and Trailer Sales and Leasing, Inc. (Mall Auto). From 1974 until 1978

Mall Auto was operated by a business manager, Billy C. Neely. In 1978 William P. Roller purchased 50% of the capital stock of Mall Auto and began operating the business as manager. In December 1979 Roller left the management of the business but retained his 50% stock interest. Stewart assumed management of Mall Auto but continued his primary occupation in the insurance business with the Parker Agency.

During Mall Auto's business life, financing was arranged primarily with the First National Bank of Sullivan County and the United Security Bank. In 1975 Bob N. Davidson, United Security's president and chief executive officer, solicited and obtained Mall Auto's banking business as the result of contacts with Stewart. The Bank's normal business contact was with Billy C. Neely, Mall Auto's general manager.

In May 1980, Fred Flick became chief executive officer at the United Security Bank. At that time Mall Auto's loans totaling some $110,000.00, as well as one or more of Stewart's personal loans, were in default. Flick did not personally know Stewart but contacted him by phone and arranged a meeting for July 1 at Stewart's place of business. At that meeting Flick requested a current financial statement and Stewart furnished him with a photocopy of a statement dated September 30, 1979. Ex. 10. After considerable discussion, the loans were renewed for a ninety day period.[1] In October 1980 the Bank asked for payment but Stewart was unable to pay. Stewart requested that he be permitted to conduct a sale of Mall Auto's rolling stock. The sale was unsuccessful, however, and in December 1980 the Bank foreclosed its security interest in Mall Auto's inventory at public auction.

On January 7, 1981, the Bank instituted suit in the State Court against Mall Auto; Stewart; his wife, Joyce Stewart; William P. Roller; Judy Roller; and Stewart's son and daughter, Gary and Donna Stewart, averring that Stewart, his wife, his two children, and the Rollers had guaranteed the debts of Mall Auto. The Bank also separately instituted suit against Bill J. Stewart and Joyce Stewart for personal loans. On January 19, 1981, the Bank filed an involuntary petition in bankruptcy against Bill J. Stewart. 11 U.S.C. § 303. On April 23, 1981, an order for relief under Chapter 7 was granted.

On May 13, 1981, the state court entered an order dismissing Joyce T. Stewart as a defendant. Also, on the same date, the court entered a judgment against Mall Auto in the amount of $127,426.88. A default judgment had previously been entered against the Rollers. Gary Stewart and Donna Stewart were never served with process. Since Bill J. Stewart was at that time the debtor in a bankruptcy case, no judgment was entered against him. The Bank's complaint to determine the dischargeability of its debts was subsequently filed. 11 U.S.C. § 523; Bankruptcy Rule 701.

## II

The first allegation of nondischargeability by the Bank relates to purported guaranties by Stewart's wife and children. The Bank alleges—

1. That Stewart presented to the Bank several guaranties bearing not only his own signature but also the signature of his wife, his son, and his daughter.

2. That Stewart's wife denies her signature on the guaranties.

3. That Stewart stated under oath that his children's signatures were not genuine.

4. That Stewart supplied the guaranties to the Bank with an intent to deceive and to influence the Bank to make loans to Mall Auto.

5. That the Bank reasonably relied upon the guaranties in making loans to Mall Auto.

The first guaranty is dated May 5, 1976, and bears the signature of Joyce L. Stewart (Stewart's wife) guaranteeing the payment

---

1. Not all of the loans were due at that time. Those that were due were renewed, upon payment of interest, and others were renewed as they became due within the next few weeks.

of all notes and papers of Bill J. Stewart. Ex. 7.

The second guaranty is dated July 11, 1977, and guarantees the payment of all notes or papers of Mall Auto. The statement admittedly is signed by Bill J. Stewart and also bears the signatures of Gary Stewart and Donna Stewart (Stewart's children). Ex. 2.

A third guaranty is dated October 4, 1978, guarantees the payment of all notes or papers of Bill Stewart up to the sum of $15,000, and bears the signature of Stewart's wife, Joyce L. Stewart. Ex. 8.

Joyce L. Stewart denies that her signatures are genuine. "I have never executed any guaranties to United Security Bank." Mrs. Stewart also denies that she executed two notes payable to the Bank, one in the amount of $15,000.00 dated October 4, 1978, and one in the amount of $3,750.00 dated May 5, 1976, Col. Ex. 11, which bear her signature. Mrs. Stewart further denies that she ever authorized anyone to sign her name to these notes or to any document. Tr., p. 46.

Neither Gary Stewart nor Donna Stewart, Stewart's children, were called as witnesses. Mrs. Stewart testified that the signatures on the July 11, 1977, guaranty, Ex. 2, "do not appear to be the·signatures of my children."

Bill J. Stewart testified that he never signed his wife's name to any guaranty or any note. Tr., p. 72.

On the basis of this testimony the Bank asks this court to conclude that the signatures of the wife and children are forgeries and that Stewart forged or caused the signatures to be forged to the documents. That someone forged Mrs. Stewart's signature to the documents cannot be disputed. The question is whether the proof adduced by the Bank is sufficient for the court to conclude that Stewart was the person responsible for the forgeries. There appears no doubt but that Mrs. Stewart's guaranty was relied upon by the Bank in making and renewing the loans, both to Stewart individually and to Mall Auto. The Bank correctly points out that the $15,000.00 note, dated October 4, 1978, Col. Ex. 11, bears the signature of Joyce L. Stewart and Bill Stewart; that Bill Stewart admitted that the signature on the note was his signature and was genuine; that a notation on the note shows that the proceeds of the loan were to be used to settle his step-father's estate. A handwritten notation on the note states that the "wife's guaranty" secures the loan. The date of the note and the date of the guaranty, Ex. 8, are the same.

### III

The second allegation of nondischargeability relates to financial statements furnished by Stewart.

Stewart's business relations with the United Security Bank began in 1975. He negotiated numerous loans for both personal and business use. In the course of negotiating these loans, Stewart furnished the Bank a number of financial statements. The statements are dated July 15, 1975, Ex. 3; September 30, 1976, Ex. 4; September 30, 1978, Ex. 5; and September 30, 1979, Ex. 10. The statements are somewhat similar in the disclosed information. As far as this proceeding is concerned, the most critical statement is dated September 30, 1979, a photocopy of which was furnished to Mr. Flick, United Security's president, at the meeting with Stewart on July 1, 1980.

Each of the statements reflect that Stewart is the owner of 100 shares of J. T. Parker Company stock of the market value of $230,000.00 or more. Introduced as Ex. 6, however, is a Buy-Sell Agreement entered into between Stewart and the two co-owners, Wolford and Jeter, dated April 1, 1967, limiting the value of the stock as to each principal to $60,000.00 in 1975, and to $90,000.00 in 1980. The Bank insists that Stewart, an experienced businessman of many years' experience, and with full knowledge of the purpose of financial statements, nevertheless inflated the value of the stock by over $170,000.00.

The Bank also insists that Stewart listed his residential property as being "solely owned," when, in fact, the property was

held by him and his wife as tenants by the entirety. In addition to this misstatement the Bank alleges that the financial statement of September 30, 1979, lists a $75,-000.00 mortgage against the property as $37,500.00.

The Bank further alleges that Stewart listed real estate located at 449 E. Market Street, 451 E. Market Street, and three adjoining lots as his personal property when, in fact, the property belonged to the J. T. Parker Insurance Agency.

At his meeting with Stewart on July·1, 1980, concerning the delinquent loans, Flick asked Stewart to furnish the Bank a current financial statement. Stewart thereupon gave Flick a photocopy of a statement dated September 30, 1979.[2] Flick testified that he and Stewart reviewed the statement "item by item." Tr. p. 10. Stewart told Flick that the statement was still basically accurate, that there had been no material change. Flick asked Stewart to sign the copy of the statement, which he did. Ex. 10. Flick signed as witness and noted the date and time: "7/1/80, 10:20 a. m."

Flick and Stewart also discussed Stewart's plans to take care of the loans. Stewart said that sales of cars and campers were not very good at that time but that he thought in about 90 days he could take care of a "lot of the debt." Stewart advised Flick that he had changed management and had also brought in "new parts and inventory." Flick requested that Stewart pledge additional collateral—equities in stock and equity in his home. Stewart replied that he did not want to do so because he needed those assets in order to borrow from other places. Ultimately, Flick agreed to renew the loans for a period of 90 days, which, according to Flick, was based on Stewart's net worth (as shown by his financial statement) and their discussions of Stewart's "financial position."[3]

Stewart's financial statement dated September 30, 1979, a copy of which was furnished to Flick on July 1, 1980, shows Stewart as the owner of 100 shares of stock of the J. T. Parker Insurance Agency with a market value of $299,935.75. As theretofore indicated, Stewart's 100 shares represented ⅓ of the outstanding stock interest of that corporation. According to Stewart the value of his stock interest was arrived at by multiplying the company's gross annual income by three, adding the value of the company's real and personal property and dividing the total by three.

The testimony regarding valuation is extremely ambiguous and unclear. Mr. Don Wolford, another owner of the Agency, testified the textbook formula for arriving at valuation was "one to two and a half times" the company's *net* commissions. There was no proof, however, as to the net commissions earned by the Agency. Although this court is unable to arrive at the true value of the stock on July 1, 1980, it is uncontradicted that Stewart did not advise Flick that a Buy-Sell Agreement limited the value of his ⅓ interest in the Agency at that time to $90,000.00. It is also undisputed that, later, Stewart negotiated a sale of the stock to his co-stockholders for $125,000, but even that amount is less than 50% of the value of the stock shown in the financial statement. The court therefore finds that the financial statement is materially false in that Stewart was under an affirmative duty but failed to disclose to Flick in their "item to item" discussion the limitation on the stock value resulting from the Buy-Sell Agreement.

The court finds the statement is also materially false regarding Stewart's residence located at 805 Beechwood, Kingsport, Tennessee. Schedule D of the statement shows the property to be titled in the name of "Bill J. Stewart." In fact, it was title in both Stewart's and his wife's names. Stew-

---

2. The original of this statement apparently had been furnished to the First National Bank of Sullivan County. The copy that Stewart gave Flick was in Stewart's file, unsigned.

3. The financial statements indicate Stewart's net worth as follows:

| | |
|---|---|
| July 15, 1975 | $416,474.33 |
| September 30, 1976 | 632,047.51 |
| September 30, 1978 | 858.712.43 |
| September 30, 1979 | 616,458.30 |

art says this was an error. If so, it was an expensive error insofar as the Bank is concerned. Under Tennessee law, a creditor can reach only the right of survivorship in property held as tenants by the entirety, thereby reducing to a minimal value jointly held property where the creditor holds a claim against only one of the parties.[4]

The Bank also complains about the listing by Stewart of property located at 449 E. Market Street, 451 E. Market Street, and three lots on East Market Street, adjoining. This listing shows Stewart to be the ⅓ owner when, in fact, the lots were owned and titled in the name of J. T. Parker Insurance Agency, Inc. There is no testimony by Flick, however, as to what, if any statements that Stewart made concerning the ownership of this property in their "item by item" discussion. Insofar as this proceeding is concerned, it is sufficient to find and conclude that the inclusion of the Agency property on Stewart's personal financial statement, in view of the fact that his ⅓ interest in the Agency already had been listed (as well as highly inflated), supports this court's ultimate finding that the statement was materially false and furnished to the Bank with an intent to deceive.

## IV

11 U.S.C. § 523(a) enacts that a discharge under § 727, § 1141, or § 1328(b) of Title 11 does not discharge an individual debtor from any debt—

"(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; or

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; . . . ."

■ Section 523(a)(2) is derived, with slight modifications, from § 17(a)(2) of the Bankruptcy Act. The preamble to § 523(a)(2) adds "refinancing of credit." By the explicit reference to refinancing of credit, it was intended to clarify that a "renewal of credit" included a "refinancing of credit." 3 Collier on Bankruptcy § 523.-07 (15th Ed.).

"As under Bankruptcy Act § 17a(2), a debt for obtaining money, property, services, or an extension or renewal of credit by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debtor's financial condition that is materially false, on which the creditor reasonably relied, and that the debtor made or published with intent to deceive, is excepted from discharge. This provision is modified only slightly from current section 17a(2). First, 'actual fraud' is added as a grounds for exception from discharge. Second, the creditor must not only have relied on a false statement in writing, the reliance must have been reasonable. This codifies case law construing this provision. Third, the phrase 'in any manner whatsoever' that appears in current law after 'made or published' is deleted as unnecessary. The word 'published' is used in the same sense that it is used in slander actions." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 364, *Reprinted in* [1978] U.S.Code Cong. & Ad.News 5787, 5963, 6320.

The fraud referred to in former § 17(a)(2) was held to mean positive fraud

---

4. In a separate adversary proceeding in this case, the trustee sought to sell both the estate's interest and the spouse's interest in the Beechwood Street property. Adv. No. 3–81–0712. The trustee was unsuccessful, however, and the sale was limited to the debtor's right of surviv-orship. See opinion entered November 9, 1981. The trustee has been unable to sell the right of survivorship and in all probability will be unable to do so. Had title to the property been held solely by the debtor, the trustee's recovery would have been substantial.

or fraud in fact; involving moral turpitude or intentional wrong and not implied fraud which may exist without the imputation of bad faith or immorality. See *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586; *Western Union Cold Storage Co. v. Hurd*, 116 F. 442 (WD Mo.1902); *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915). *U. S. v. Syros*, 254 F.Supp. 195 (DC ED Mo.1966). Vol. 1A, Collier on Bankruptcy, ¶ 17.16[3] (14th Ed.).

"Prior decisions unanimously require proof of actual fraud involving moral turpitude... 'In order for § 17, sub a(2) to bar a discharge, the party alleging fraud must meet the requirements of proving positive fraud....'" *Wright v. Lubinko*, 515 F.2d 260 (9th Cir. 1975).

■ The plaintiff has the burden of proving the facts essential to his objection. Bankruptcy Rule 407. Further, fraud is never presumed; it must be proven. *Snapp v. Moore*, 2 Tenn. 236 (1814). Except where a fiduciary relationship exists, fraud must be proven by "clear and cogent" evidence. *Groves v. Witherspoon*, 379 F.Supp. 52 (E.D. Tenn.1974).

■ Plaintiff has carried its burden of proof. The guaranties of Stewart's wife and children are false. The signatures of Stewart's wife on the June 19, 1978, and October 4, 1978, notes are false; Stewart's signature is genuine. Stewart obtained the loans. These are basic facts. The inference (inferred fact) that Stewart signed or caused someone else to sign his wife's name to the notes is a permissibly inferred fact.

"Inferred factual conclusions are drawn from basic facts and are permitted only when, and to the extent that, logic and human experience indicates a probability that certain consequences can and do follow from the basic facts." *Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98 (3rd Cir. 1981).

The financial statement furnished to the Bank on July 1, 1980, during the meeting of Flick and Stewart, is also materially false. The value of the J. T. Parker stock could under no conceivable circumstance have had a value of $299,935.75, in view of the Buy-Sell Agreement binding upon Stewart. Nor did Stewart advise Flick of the stock limitation. The listing of the real property was false and misleading. Stewart made these representations with actual knowledge that many of the statements were incorrect, or with reckless indifference to the actual facts and with no reasonable ground to believe that they were, in fact, correct. *Morimura, Arai & Co. v. Taback*, 279 U.S. 24, 49 S.Ct. 212, 73 L.Ed. 586; *Third National Bank v. Schatten*, 81 F.2d 538 (6th Cir. 1936). The debtor's unsupported assertion of an honest intent will not overcome the natural inference from admitted facts. See *In re Moran*, 456 F.2d 1030 (3rd Cir. 1972). There was an intent to deceive. Relying upon the statements and the guaranties of Stewart's wife and children, the Bank renewed both Mall Auto's and Stewart's loans. The reliance was reasonable, especially in view of Stewart's averred overall net worth of over $600,000.00.

Stewart's debts owing to the United Security Bank are nondischargeable. 11 U.S.C. § 523(a)(2)(A), (B).

Submit Judgment within five days.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.